UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE PROPERTY & CASUALTY<br>INSURANCE COMPANY, AND<br>ALLSTATE FIRE & CASUALTY INSURANCE<br>COMPANY,<br><br><br>Plaintiffs,<br><br>v.<br><br>JONATHAN S. LANDOW, M.D.,<br>VIVIANE ETIENNE, M.D.,<br>ATLANTIC MEDICAL & DIAGNOSTIC, P.C.,<br>BIRCH MEDICAL & DIAGNOSTIC, P.C.,<br>EASTERN MEDICAL PRACTICE, P.C.,<br>EMPIRE MEDICAL SERVICES, P.C.,<br>MACINTOSH MEDICAL, P.C.,<br>PARAMOUNT MEDICAL SERVICES, P.C.,<br>PREFERRED MEDICAL, P.C.,<br>SOVEREIGN MEDICAL SERVICES, P.C.,<br>SPRUCE MEDICAL & DIAGNOSTIC, P.C.,<br>SUMMIT MEDICAL SERVICES, P.C.,<br>URBAN MEDICAL, P.C.,<br>ROMAN ISRAILOV a/k/a ROMAN MATATOV,<br>URIYEL MIRZAKANDOV, AND<br>RUBEN LEVY a/k/a RUBEN LEVIYEV,<br><br>Defendants. | C.A. No.___ |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property &

Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, (collectively,

"Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick, & Brink, P.C., allege

as follows:

I.    **INTRODUCTION**

1.    This case centers on a series of illegally owned professional medical corporations ("PCs"), all purportedly incorporated and controlled by a licensed medical doctor, Jonathan S. Landow, M.D. ("Landow"), including Atlantic Medical & Diagnostic, P.C. ("Atlantic")[1], Birch Medical & Diagnostic, P.C. ("Birch"), Eastern Medical Practice, P.C. ("Eastern"), Empire Medical Services, P.C. ("Empire"), Macintosh Medical, P.C. ("Macintosh"), Paramount Medical Services, P.C. ("Paramount"), Preferred Medical, P.C. ("Preferred"), Sovereign Medical Services, P.C. ("Sovereign"), Spruce Medical & Diagnostic, P.C. ("Spruce"), Summit Medical Services, P.C. ("Summit"), and Urban Medical, P.C. ("Urban") (collectively, the "PC Defendants").

2.    Several of the PC Defendants were incorporated in or prior to 2002, but remained dormant for many years, until they started billing insurers for purported pain management and primary care treatment in or around 2016.

3.    On information and belief, the PC Defendants only started billing insurers because of a series of significant judgments issued against Landow, who needed a way to quickly generate funding to repay his debts. *See, e.g., Landow v. Commissioner of Internal Revenue*, 2011 T.C. Memo. 177 (U.S. Tax Court, 2011); *Landow v. Wachovia Securities, et al.*, 966 F. Supp. 2d 106 (E.D.N.Y. 2013); *Carbon Capital Mgt., LLC v. American Express Co.*, 2010 NY Slip Op 30477(U) (Sup. Ct. Nassau Cty. 2010); *Bronte SPV, LLC v. Jonathan Landow, et al.*, Index No. 601591/2017 (Sup. Ct. Nassau Cty. 2017).

4.    The PC Defendants maintain no standalone practices, and operate on a transient basis from a series of medical clinics throughout the New York City metropolitan area.

---

[1] Atlantic is co-owned by Defendants Landow and Viviane Etienne, M.D.

5.      Landow does not advertise the PC Defendants, and does nothing to attract a legitimate patient base.

6.      Instead, Landow enters into "sublease" and "license" agreements with the purported owners of these medical clinics, pursuant to which the PC Defendants "rent" space.

7.      These "sublease" and "license" agreements are, in fact, a covert method of funneling professional profits to the lay owners of the medical clinics in exchange for access to their patient base and referral network.

8.      These lay owners include individuals with a long history in the No-Fault fraud arena, including, but not limited to, Roman Israilov A/K/A Roman Matatov ("Israilov"), Uriyel Mirzakandov ("Mirzakandov"), and Ruben Levy A/K/A Ruben Leviyev ("Levy") (collectively, the "Management Defendants").

9.      Each of these individuals has previously participated in No-Fault fraud schemes alongside Landow and other New York-area medical providers. *See, e.g., GEICO, et al. v. Chumaciero, et al.*, Civil Action No. 1:20-cv-02220 (E.D.N.Y. 2020); *Travelers Ins. Co. v. Landow, et al.*, N.Y. Sup. Ct., Index No. 656567/2021 (2021); *United States v. Rose*, Criminal Action No. 1:19-cr-00789 (S.D.N.Y. 2019); *United States v. Gulkarov,* Criminal Action No. 1:22-cr-00020 (S.D.N.Y. 2022).

10.     The PC Defendants, despite operating under different names, are all operated interchangeably, switching the name and TIN of the PC but continuing the exact same pattern of billing and treatment any time insurer scrutiny intensifies.

11.     As explained herein, throughout the course of this scheme, the defendants (or those working under their direction and control) purposely induced Allstate to pay the PC Defendants for excessive and medically unnecessary tests and services purportedly provided to Allstate

Claimants while knowing that the charges for these tests and services were not compensable under New York law.

12.    These No-Fault benefit claims were not compensable under New York law because the PC Defendants (a) were not legally formed or operated in accordance with New York law, (b) rendered medically unnecessary and excessive treatment, (c) rendered treatment and services pursuant to unlawful referrals, (d) fraudulently billed for treatment and services that were not performed as described, and/or (e) billed for treatments and services even though the PC Defendants' true owner(s) did not engage in the practice of the profession for which the PC Defendants were incorporated.

13.    The success of the defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law.

14.    Allstate reasonably relied on the facial validity of the PC Defendants' documents— and representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

15.    By this Complaint, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

16.    Through this action, Allstate seeks to recover all monies wrongfully paid to Atlantic, Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban.

17.     Specifically, Allstate seeks to recover actual damages totaling over $3,556,518.47 which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the defendants during the course of this scheme.

18.     Allstate also seeks a declaration that it has no legal obligation to make any payments on any No-Fault claims that have been submitted by (or on behalf of) Atlantic, Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban, because the treatments and services purportedly provided to Allstate-covered patients were rendered in direct violation of one or more New York State licensing requirements necessary to provide such treatments and services, thus rendering Atlantic, Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

19.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

20.     Each defendant named herein conspired with at least one other defendant to accomplish and to further the objectives of their scheme to defraud.

21.     The defendants purposely designed and executed this scheme with the express aim of eliciting payments of automobile insurance contract proceeds from Allstate to Atlantic, Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban, for the benefit of each and all of the defendants named herein.

22.     The defendants knew that the patients identified in this Complaint were eligible for insurance coverage through automobile insurance policies issued by Allstate.

23.     Allstate estimates that the defendants, in furtherance of this scheme, purposely and knowingly submitted to Allstate hundreds of bills on behalf of the PC Defendants knowing that

5

none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.    THE PARTIES

### A.    PLAINTIFFS

24.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

25.    At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, were each authorized to conduct business in New York.

### B.    DEFENDANTS

#### 1.    Jonathan S. Landow, M.D.

26.    Landow resides in and is a citizen of the States of New York and Florida, and splits his time between the states.

27.    At all relevant times, Landow has been licensed to provide medical services in the State of New York.

28.    According to records on file with the New York Department of State, Landow is the sole shareholder, officer, and director of Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban.

29.     According to records on file with the New York Department of State, Landow is one of the shareholders, officers, and/or directors of Atlantic, with Viviane Etienne, M.D. ("Etienne").

30.     At all relevant times, unlicensed laypersons—and not Landow—unlawfully owned, operated, and controlled the PC Defendants.

31.     At all relevant times, these unlicensed laypersons directed Landow and/or his agents at the PC Defendants to provide excessive and medically unnecessary treatments and tests to patients of the PC Defendants.

32.     When patients sought treatment and tests from the PC Defendants, they were caused to enter into assignment of benefits agreements with the PC Defendants, thus giving the PC Defendants the right to seek No-Fault payments directly from insurers.

33.     As assignees of their patients' benefits, the PC Defendants sought and collected No-Fault payments directly from insurers, including Allstate.

34.     As detailed herein, the PC Defendants purposely sought No-Fault benefit payments from Allstate knowing that the PC Defendants were not lawfully eligible to seek or collect such payments.

35.     Because he directly participated in the operation and management of the PC Defendant enterprises throughout the course of this scheme, Landow is responsible for the fraudulent services provided to patients of these entities, and thereby also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 2.     Viviane Etienne, M.D.

36.     Etienne resides in and is a citizen of the States of New York.

37.    At all relevant times, Etienne has been licensed to provide medical services in the State of New York.

38.    According to records on file with the New York Department of State, Etienne is one of the shareholders, officers, and/or directors of Atlantic, with Landow.

39.    Etienne also provided services to Allstate claimants on behalf of the other PC Defendants.

40.    At all relevant times, unlicensed laypersons—and not Etienne—unlawfully owned, operated, and controlled the PC Defendants.

41.    At all relevant times, these unlicensed laypersons directed Etienne and/or her agents at the PC Defendants to provide excessive and medically unnecessary treatments and tests to patients of the PC Defendants.

42.    When patients sought treatment and tests from the PC Defendants, they were caused to enter into assignment of benefits agreements with the PC Defendants, thus giving the PC Defendants the right to seek No-Fault payments directly from insurers.

43.    As assignees of their patients' benefits, the PC Defendants sought and collected No-Fault payments directly from insurers, including Allstate.

44.    As detailed herein, the PC Defendants purposely sought No-Fault benefit payments from Allstate knowing that the PC Defendants were not lawfully eligible to seek or collect such payments.

45.    Because she directly participated in the operation and management of the PC Defendant enterprises throughout the course of this scheme, Etienne is responsible for the fraudulent services provided to patients of these entities, and thereby also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 3.    **Management Defendants**

#### a.    *Roman Israilov, A/K/A Roman Matatov*

46.    Israilov resides in and is a citizen of the State of New York.

47.    At no time has Israilov been licensed or otherwise authorized to practice medicine in the State of New York or elsewhere.

48.    During the relevant period, Israilov exerted control over the day-to-day operation and management of the PC Defendants.

49.    Israilov siphoned funds from the PC Defendants through fraudulent "lease" and "license" agreements between the PC Defendants and certain New York area No-Fault clinics.

50.    As detailed herein, Israilov participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of the PC Defendants through a pattern of mail fraud racketeering activity.

51.    Israilov furthered the objectives of this scheme by: (a) seizing control of the PC Defendants despite not being authorized to provide, or manage the provision of, medical treatments and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of unnecessary tests, treatments, prescriptions, and referrals, (d) submitting No-Fault benefit claims to Allstate that contained false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (e) causing the PC Defendants to collect payments that they were not lawfully entitled to collect, (f) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit using other companies under his control, and (g) bribing medical providers and first responders for confidential patient information in order to steer patients to the facilities under his control.

52.     Because he directly participated in the operation and management of each of the PC Defendant enterprises throughout the course of this scheme, Israilov is responsible for the fraudulent services rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**b.     *Uriyel Mirzakandov***

53.     Mirzakandov resides in and is a citizen of the State of New York.

54.     At no time has Mirzakandov been licensed or otherwise authorized to practice medicine in the State of New York or elsewhere.

55.     During the relevant period, Mirzakandov exerted control over the day-to-day operation and management of the PC Defendants.

56.     Mirzakandov siphoned funds from the PC Defendants through fraudulent "lease," "license," and "service" agreements between the PC Defendants and certain New York area No-Fault clinics.

57.     As detailed herein, Mirzakandov participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of the PC Defendants through a pattern of mail fraud racketeering activity.

58.     Mirzakandov furthered the objectives of this scheme by: (a) seizing control of the PC Defendants despite not being authorized to provide, or manage the provision of, medical treatments and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of unnecessary tests, treatments, prescriptions, and referrals, (d) submitting No-Fault benefit claims to Allstate that contained false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (e) causing the PC Defendants to collect payments that they were not lawfully entitled to collect,

and (f) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit using other companies under his control.

59.     Because he directly participated in the operation and management of each of the PC Defendant enterprises throughout the course of this scheme, Mirzakandov is responsible for the fraudulent services rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### c.      *Ruben Levy, A/K/A Ruben Leviyev*

60.     Levy resides in and is a citizen of the State of New York.

61.     At no time has Levy been licensed or otherwise authorized to practice medicine in the State of New York or elsewhere.

62.     During the relevant period, Levy exerted control over the day-to-day operation and management of the PC Defendants.

63.     Levy siphoned funds from the PC Defendants through fraudulent "lease," "license," and "service" agreements between the PC Defendants and certain New York area No-Fault clinics.

64.     As detailed herein, Levy participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of the PC Defendants through a pattern of mail fraud racketeering activity.

65.     Levy furthered the objectives of this scheme by: (a) seizing control of the PC Defendants despite not being authorized to provide, or manage the provision of, medical treatments and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of unnecessary tests, treatments, prescriptions, and referrals, (d) submitting No-Fault benefit claims to Allstate that contained false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (e) causing the PC

Defendants to collect payments that they were not lawfully entitled to collect, and (f) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit using other companies under his control.

66.    Because he directly participated in the operation and management of each of the PC Defendant enterprises throughout the course of this scheme, Levy is responsible for the fraudulent services rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 4.    PC Defendants

#### a.    *Atlantic Medical & Diagnostic, P.C.*

67.    Atlantic is organized under New York law as a professional service corporation.

68.    As organized, Atlantic was authorized to provide professional physician services.

69.    Atlantic maintained its principal executive office at 575 Underhill Boulevard, Suite #225, Syosset, New York during the relevant period.

70.    Atlantic treated patients from a series of New York area multi-disciplinary clinics.

71.    Landow and Etienne are the sole registered officers, directors, and shareholders of Atlantic.

#### b.    *Birch Medical & Diagnostic, P.C.*

72.    Birch is organized under New York law as a professional service corporation.

73.    As organized, Birch was authorized to provide professional physician services.

74.    Birch maintained its principal executive office at 575 Underhill Boulevard, Suite #225, Syosset, New York, during the relevant period.

75.    Birch treated patients from a series of New York area multi-disciplinary clinics.

76.    Landow is the sole registered officer, director, and shareholder of Birch.

### c.    *Eastern Medical Practice, P.C.*

77.    Eastern is organized under New York law as a professional service corporation.

78.    As organized, Eastern was authorized to provide professional physician services.

79.    Eastern maintained its principal executive office at 2 Jericho Plaza, Wing B, Jericho, New York during the relevant period.

80.    Eastern treated patients from a series of New York area multi-disciplinary clinics.

81.    Landow is the sole registered officer, director, and shareholder of Eastern.

### d.    *Empire Medical Services, P.C.*

82.    Empire is organized under New York law as a professional service corporation.

83.    As organized, Empire was authorized to provide professional physician services.

84.    Empire maintained its principal executive office at 575 Underhill Boulevard, Suite #225, Syosset, New York during the relevant period.

85.    Empire treated patients from a series of New York area multi-disciplinary clinics.

86.    Landow is the sole registered officer, director, and shareholder of Empire.

### e.    *Macintosh Medical, P.C.*

87.    Macintosh is organized under New York law as a professional service corporation.

88.    As organized, Macintosh was authorized to provide professional physician services.

89.    Macintosh maintained its principal operating address at 3530 Mystic Pointe Drive, Suite 1402, Aventura, Florida, during the relevant period.

90.    Macintosh's administrative offices were located at 1 Jericho Plaza, Jericho, New York, and 575 Underhill Boulevard, Syosset, New York, during the relevant period.

91.     Macintosh treated patients from a series of New York area multi-disciplinary clinics.

92.     Landow is the sole registered officer, director, and shareholder of Macintosh.

**f.      *Paramount Medical Services, P.C.***

93.     Paramount is organized under New York law as a professional service corporation.

94.     As organized, Paramount was authorized to provide professional physician services.

95.     Paramount maintained its principal operating address at 45 East 89th Street, Suite 180, New York, New York, during the relevant period.

96.     Paramount treated patients from a series of New York area multi-disciplinary clinics.

97.     Landow is the sole registered officer, director, and shareholder of Paramount.

**g.      *Preferred Medical, P.C.***

98.     Preferred is organized under New York law as a professional service corporation.

99.     As organized, Preferred was authorized to provide professional physician services.

100.    Preferred maintained its principal operating address at 45 East 89th Street, Suite 18D, New York, New York, during the relevant period.

101.    Preferred treated patients from a series of New York area multi-disciplinary clinics.

102.    Landow is the sole registered officer, director, and shareholder of Preferred.

**h.      *Sovereign Medical Services, P.C.***

103.    Sovereign is organized under New York law as a professional service corporation.

104.    As organized, Sovereign was authorized to provide professional physician services.

105.    Sovereign maintained its principal executive office at 174 West 4th Street, Suite 324, New York, New York, during the relevant period.

106.    Sovereign treated patients from a series of New York area multi-disciplinary clinics.

107.    Landow is the sole registered officer, director, and shareholder of Sovereign.

**i.    *Spruce Medical & Diagnostic, P.C.***

108.    Spruce is organized under New York law as a professional service corporation.

109.    As organized, Spruce was authorized to provide professional physician services.

110.    Spruce maintained its principal executive office at 575 Underhill Boulevard, Suite #225, Syosset, New York, during the relevant period.

111.    Spruce treated patients from a series of New York area multi-disciplinary clinics.

112.    Landow is the sole registered officer, director, and shareholder of Spruce.

**j.    *Summit Medical Services, P.C.***

113.    Summit is organized under New York law as a professional service corporation.

114.    As organized, Summit was authorized to provide professional physician services.

115.    Summit maintained its principal executive office at 575 Underhill Boulevard, Suite #225, Syosset, New York, during the relevant period.

116.    Summit treated patients from a series of New York area multi-disciplinary clinics.

117.    Landow is the sole registered officer, director, and shareholder of Summit.

**k.    *Urban Medical, P.C.***

118.    Urban is organized under New York law as a professional service corporation.

119.    As organized, Urban was authorized to provide professional physician services.

120.    Urban maintained its principal executive office at 100 Hilton Avenue, #803, Garden City, New York, during the relevant period.

121.    Urban treated patients from a series of New York area multi-disciplinary clinics.

122.    Landow is the sole registered officer, director, and shareholder of Urban.

III.    **JURISDICTION AND VENUE**

123.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

124.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

125.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

126.    At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

127.    The Defendants' activities and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

128.    As the allegations and causes of action in the within Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

IV.    **APPLICABLE LAWS AND REGULATIONS**

A.    **NEW YORK NO-FAULT LAWS**

129.    Allstate underwrites motor vehicle insurance in the State of New York.

130.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

131.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

132.    Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

133.    "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. *See* N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

134.    These necessary expenses include physical therapy that is rendered pursuant to a referral from a physician. *See* N.Y. INS. LAW § 5102(a)(1).

135.    These No-Fault benefits include up to $50,000 per claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

136.    A claimant may assign his or her No-Fault Benefits to third parties, such as healthcare service providers.

137.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

138.    Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

139.    The NF-3 and CMS-1500 forms are important documents in the insurance industry. These documents certify that the provider's request for payment is not materially false, misleading, or fraudulent. *See* 11 N.Y.C.R.R. § 65.3-11(a); N.Y. INS. LAW § 403(d).

140.    Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

141.    It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

### B.    NEW YORK EDUCATION LAW

142.    New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. EDUC. LAW § 6522.

143.    Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

144.    Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

145.    Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

146.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

C.    NEW YORK BUSINESS CORPORATION LAW

147.    In New York, professional service corporations are governed by §§ 1501-1516 of the Business Corporation Law.

148.    Under Business Corporation Law § 1504, professional service corporations cannot render professional services except through individuals authorized by law to render such professional services.

149.    Moreover, under Business Corporation Law § 1507, a professional service corporation cannot issue shares to individuals unless they are "engaged in the practice of such profession in such [a] corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service corporation is authorized to practice.

150.    Pursuant to Business Corporation Law § 1508, each director or officer of a professional service corporation must be authorized by law to practice in New York the profession that such corporation is authorized to practice.

151.    Taken together, the restrictions set forth under the No-Fault Laws, the Education Law, and the Business Corporation Law are designed to ensure that professional service entities are operated and controlled by individuals that are authorized to practice in the professional discipline(s) offered by the entity.

152.    New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet ***any*** applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

153.    In *State Farm Mut. Auto. Ins. Co. v. Mallela*, the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (N.Y. 2005).

154.    As such, a professional service corporation is lawfully ineligible to seek or receive No-Fault benefit payments if the entity, or any of its members, fails to meet ***any*** applicable licensing requirement necessary to perform a service. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

155.    Under prevailing law, an insurer may maintain a cause of action to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)) to healthcare providers that are organized, operated, and/or controlled in violation of New York law. *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006).

D.    APPLICABLE NEW YORK LAW PROHIBITING CERTAIN REFERRAL ARRANGEMENTS

156.    A practitioner who is authorized to order "clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services" is prohibited from making a referral for such services to a healthcare provider who is authorized to provide such services where the practitioner or immediate family member of said practitioner has a financial relationship with the healthcare provider. *See* N.Y. PUB. HEALTH LAW § 238-a(1)(a).

157.    A financial relationship is defined as an ownership interest, investment interest or compensation arrangement. *See* N.Y. PUB. HEALTH LAW § 238(3).

158.    A compensation arrangement includes "any arrangement involving any remuneration between a practitioner, or immediate family member, and a healthcare provider. The term remuneration includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *See* N.Y. PUB. HEALTH LAW § 238-a(5)(a).

159.    Pursuant to Section 238-a(1)(b) of the New York Public Health Law, neither a healthcare provider nor a referring practitioner may present a claim, bill or any other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services when furnished pursuant to a prohibited referral arrangement.

160.    Any such claims, bills or other demands made in connection with an illegal referral arrangement that results in payment to the referring practitioner or healthcare provider shall result

in the referring practitioner and healthcare provider being jointly and severally liable for any amount collected. *See* N.Y. PUB. HEALTH LAW § 238-a(7).

161.    With respect to referrals not prohibited under Section 238-a, a practitioner may not make a referral to a healthcare provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has a financial relationship with the healthcare provider (i.e., ownership or investment interest or a compensation arrangement that is in excess of fair market value or that provides for compensation that varies directly or indirectly based on the volume or value of any referrals of business between the parties) without disclosing the financial relationship to the patient, which disclosure must provide notice of the financial relationship as well as inform the patient of his or her right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available. *See* N.Y. PUB. HEALTH LAW § 238-d(1)-(2).

162.    Additionally, New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

163.    Likewise, under Rule 29.1(b)(3) of the Board of Regents, applicable to "the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law"— which includes physical therapy, chiropractic, and acupuncture—practitioners are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 11 N.Y.C.R.R. § 29.1(b)(3).

164.    Accordingly, New York law prohibits any licensed physician, physical therapist, chiropractor, or acupuncturist from giving and/or receiving payment to and/or from another licensee or third party in exchange for the referral of a patient.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    GENERAL OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD ALLSTATE

165.    The Defendants knowingly and intentionally engaged in conduct to defraud insurers through the submission of false and fraudulent No-Fault benefit claims.

166.    Allstate was and is one of the No-Fault insurance providers victimized by this scheme.

167.    New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services and is also designed to facilitate prompt payment of patient claims.

168.    As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

169.    As it applies to professional healthcare services provided in the State of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet **_any_** New York state or local licensing requirement necessary to perform such services in New York.

170.    Landow, Etienne, and the Management Defendants were well aware of these conditions of reimbursement when they decided to take advantage of New York's No-Fault system and defraud Allstate by creating multiple entities that provided physician services to patients (i.e., the PC Defendants).

171.    By virtue of their nominal ownership of the PC Defendants, Landow and Etienne, in partnership with the Management Defendants, were able to engage in the following misconduct as a means to propel this scheme:

- Billing Allstate for excessive and medically unnecessary treatment, or treatment that was not rendered as billed;

- Siphoning revenue from the PC Defendants—revenue that was generated from the provision of healthcare services to patients of the PC Defendants; and

- Devising unlawful referral arrangements among the PC Defendants, which allowed Landow and Etienne to pay kickbacks to the Management Defendants and other unlicensed clinic owners in exchange for patient referrals.

172.    Landow, facing steadily mounting debts, opted to utilize the PC Defendants to interchangeably submit billing for fraudulent services to Allstate and other insurers.

173.    The fraudulent services were not medically necessary, and were provided pursuant to a predetermined treatment protocol designed to maximize the reimbursement collected by the PC Defendants, rather than to benefit patients.

174.    In fact, the PC Defendants engaged in a pattern of overbilling for "unlisted" medical services, including purported trigger point impendence imaging ("TPII") and localized intense neurostimulation therapy ("LINT") services.

175.    These treatments purported to identify and attempt to relieve trigger points through electrical stimulation, which is a service typically billed for a small fraction of the amount billed by the PC Defendants.

176.    However, the PC Defendants carefully avoided the No-Fault fee schedule by billing such treatments under "unlisted" codes (i.e., CPT Code 99199) instead of the appropriate codes, which would have imposed a cap on reimbursement (i.e., CPT Codes 97032 and 76942).

177.    This allowed the PC Defendants to submit disproportionately high bills to Allstate for unnecessary and excessive medical services.

178.    From 2016 to present, Landow has rotated through the PC Defendants, utilizing each entity concurrently or in succession with others to circumvent Allstate's attempts to investigate Landow's practices.

179.    At all times relevant to this action, Landow and Etienne ensured a steady patient base at each of the PC Defendants by entering into fraudulent "sublease" and "license" agreements with the lay owners of various multi-disciplinary clinics throughout the New York metropolitan area, pursuant to which Landow and/or Etienne provided illegal "kickback" payments to these lay owners in exchange for access to the respective clinic's patient base.

180.    Such conduct is not only prohibited under New York law, but was also dangerous to the patients who were subjected to these clinically unwarranted and unneeded tests, treatments, prescriptions and referrals.

181.    Throughout the entirety of this scheme, the Landow, Etienne, and the Management Defendants caused the PC Defendants to be operated in violation of New York law, and, as such, the PC Defendants' claims for No-Fault reimbursement were never lawfully compensable under New York law.

**B.    FRAUDULENT OPERATION, MANAGEMENT, AND CONTROL OF THE PC DEFENDANTS**

**1.    Unlawful Financial and Referral Arrangements**

182.    The PC Defendants operated, successively and/or concurrently, from several locations throughout the New York metropolitan area.

183.    However, Landow and Etienne did not advertise the PC Defendants, and did nothing to build a legitimate patient base or attract patients to these clinics.

184.    Instead, Landow and Etienne relied exclusively on patient referrals from the No-Fault clinics from which they "subleased" space.

185.    The PC Defendants operated from various multi-disciplinary "clinics" across New York State, all of which maintained a steady patient base through an unlawful referral network consisting of "runners," who paid bribes in exchange for patient information and/or who participated in the staging of motor vehicle accidents. These clinics operated out of the following addresses:

- 3910 Church Avenue, Brooklyn, NY;
- 332 149th Street, Bronx, NY;
- 430 West Merrick Road, Valley Stream, NY;
- 513 Church Avenue, Brooklyn, NY;
- 647 Bryant Avenue, Bronx, NY;
- 1320 Louis Nine Boulevard, Bronx, NY;
- 4250 White Plains Road, Bronx, NY;
- 11 East Hawthorne Avenue, Valley Stream, NY;
- 787 Meacham Avenue, Elmont, NY;
- 420 Doughty Boulevard, Inwood, NY;
- 599 Southern Boulevard, Bronx, NY;
- 8555 Little Neck Parkway, Floral Park, NY;
- 4014A Boston Road, Bronx, NY;
- 3407 White Plains Road, Bronx, NY;
- 1220 E. New York Avenue, Brooklyn, NY;
- 2940 Grand Concourse, Bronx, NY;
- 82-25 Queens Boulevard, Elmhurst, NY;
- 1120 Morris Avenue, Bronx, NY;
- 139 North Central Avenue, Valley Stream, NY;
- 152-90 Rockaway Boulevard, Jamaica, NY;
- 1568 Ralph Avenue, Brooklyn, NY;
- 222-01 Hempstead Avenue, Queens, NY;
- 615 Seneca Avenue, Brooklyn, NY;
- 800 St. Ann's Avenue, Brooklyn, NY;
- 492 Lefferts Avenue, Brooklyn, NY;
- 1767 Southern Boulevard, Bronx, NY;
- 1279 Ralph Avenue, Brooklyn, NY;
- 2386 Jerome Avenue, Bronx, NY;
- 240-19 Jamaica Avenue, Bellerose, NY;
- 2 Wilson Place, Suite 3, Mount Vernon, NY; and
- 201 Dolson Avenue, Middletown, NY.

186.    The list above is non-exhaustive—several of the PC Defendants operated from additional No-Fault clinics in the area.

187.    The various PC Defendants operated, concurrently and successively, through these medical mills, billing under different TINs and entity names, but utilizing the same facilities and staff, and providing the same treatments.

188.    The intertwined nature of the PC Defendants is demonstrated by the chart below, which details a selection of known clinic locations and associated PC Defendants.

| Clinic Address | PC Defendants Operating at Location |
|---|---|
| 332 E. 149th Street, Suite 200, Bronx, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Macintosh Medical, P.C.<br>• Paramount Medical Services, P.C.<br>• Preferred Medical, P.C.<br>• Summit Medical Services, P.C.<br>• Urban Medical, P.C. |
| 4014A Boston Road, Bronx, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Paramount Medical Services, P.C.<br>• Preferred Medical, P.C.<br>• Spruce Medical & Diagnostic, P.C.<br>• Summit Medical Services, P.C. |
| 3910 Church Avenue, Brooklyn, NY | • Atlantic Medical & Diagnostic, P.C.<br>• Macintosh Medical, P.C.<br>• Preferred Medical, P.C.<br>• Sovereign Medical Services, P.C.<br>• Spruce Medical & Diagnostic, P.C.<br>• Summit Medical Services, P.C. |
| 513 Church Avenue, Brooklyn, NY | • Atlantic Medical & Diagnostic, P.C.<br>• Birch Medical & Diagnostic, P.C.<br>• Macintosh Medical, P.C.<br>• Paramount Medical Services, P.C.<br>• Sovereign Medical Services, P.C. |
| 430 W. Merrick Road, Valley Stream, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Paramount Medical Services, P.C. |

| | |
|---|---|
| | • Preferred Medical, P.C.<br>• Spruce Medical & Diagnostic, P.C. |
| 1767 Southern Boulevard, 2nd Floor, Bronx, NY | • Sovereign Medical Services, P.C.<br>• Spruce Medical & Diagnostic, P.C. |
| 647 Bryant Avenue, #2, Bronx, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Macintosh Medical, P.C.<br>• Summit Medical Services, P.C. |
| 90-46 Corona Avenue, Elmhurst, NY | • Paramount Medical Services, P.C.<br>• Preferred Medical, P.C.<br>• Urban Medical, P.C. |
| 85-25 Queens Boulevard, Suite 1A, Elmhurst, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Paramount Medical Services, P.C.<br>• Preferred Medical, P.C.<br>• Sovereign Medical Services, P.C.<br>• Urban Medical, P.C. |
| 3407 White Plains Road, Bronx, NY | • Birch Medical & Diagnostic, P.C.<br>• Eastern Medical Practice, P.C.<br>• Paramount Medical Services, P.C. |

189.    These No-Fault clinics were owned by laypersons engaged in a widespread fraud network in New York State.

190.    By way of example, the PC Defendants operated from at least three (3) clinic locations identified in connection with the widespread No-Fault fraud scheme alleged in *United States of America v. Anthony Rose, et al.*, Case No. 1:19-cr-00789-PGG (S.D.N.Y. 2019) ("Rose Criminal Case").

191.    The indictment in the Rose Criminal Case alleged that several individuals conspired to pay bribes to hospital employees and 911 operators in exchange for patient information, and then steer patients to treat at a select network of New York and New Jersey clinics that paid kickbacks for the referrals. *See id.* at ECF No. 1.

192.    By way of further example, Defendant Paramount billed Allstate for services performed at 201 Dolson Avenue, Middletown, NY, in or around August 2017.

193.    In or around May 2019, one of the owners of the facility at 201 Dolson Avenue pleaded guilty to an indictment charging lay ownership of medical PCs at the 201 Dolson Avenue clinic and submitting fraudulent billing to insurers for medically unnecessary services. *See USA v. Spina*, 7:18-cr-00625 (S.D.N.Y.), at ECF No. 22 (Guilty Plea of James Spina).

194.    In yet another example, multiple PC Defendants (specifically, Macintosh, Paramount, Preferred, Sovereign, and Spruce) billed for services performed from 3910 Church Avenue, Brooklyn, NY.

195.    In 2020, GEICO brought a RICO suit against the providers operating from that location, alleging that the facility was a "medical mill" that performed medically unnecessary services under the unlawful direction of laypersons. *See Gov't Empls. Ins. Co., et al. v. East Flatbush Medical, P.C., et al.*, 1:20-cv-01695-MKB-PK (E.D.N.Y.).

196.    The clinics in question operated as "revolving door" medical mills, allowing an ever-changing array of providers to bill from the location in exchange for kickback payments to the clinic owners.

197.    Landow maintained a "license and services" agreement with each clinic from which the PC Defendants operated.

198.    These "license and services" agreements were all virtually identical to one another, containing the same terms and a fixed range of rent payments—the PC Defendants typically paid a fee of anywhere from $1,000 to $2,500 per month in "rent," which was purportedly based on Landow's calculation of "fair market value" for the location in question.

199.    In reality, however, the rental fees paid by Landow were based on the volume of patients referred to the PC Defendants by the clinic, in violation of the Public Health Laws.

200.    In an Examination Under Oath of Macintosh conducted by Allstate on August 5, 2020, Landow testified that he typically undergoes a "trial period" at each clinic, wherein no money is exchanged, so that he can see how he and the clinic owners work together before committing to an agreement.

201.    Landow will, therefore, not pay any "rent" until he knows how many patients he is able to access at the location, and will negotiate lower payments if there are fewer patients or fewer opportunities to bill for excessive medical services.

202.    Landow and Etienne are, furthermore, not in charge of directing patient treatment once patients are referred to the PC Defendants.

203.    Instead, the treatment protocol to which patients are subjected is directly entirely by the lay owners of each clinic, and/or the controlling medical providers of each clinic (i.e., chiropractors, physical therapists, or acupuncturists, none of whom are licensed to direct the provision of professional physician services).

204.    In exchange for the payment of kickbacks, the clinic controllers ensure that insureds are referred to the PC Defendants for fraudulent and medically unnecessary services.

205.    These unlawful kickback arrangements are crucial to the success of the Defendants' fraudulent scheme.

206.    These unlawful financial arrangements ensure the PC Defendants have access to a steady base of insureds, allowing the PC Defendants to implement their fraudulent treatment protocol, bill insurers for medically unnecessary treatment, and generate inflated income from insurance reimbursement payments.

2. **Unlawful Operation and Management of the PC Defendants and Their Finances**

207. Landow did not exercise a level of control over the PC Defendants consistent with what one would expect of a true owner of a professional medical corporation.

208. For example, Landow did not control the daily operations of the PC Defendants, including establishing a schedule and managing the logistics of appearing at a rotating array of clinics, hiring and firing employees, and negotiating lease agreements with third parties.

209. Instead, each of these tasks were controlled by Landow's "office administrator."

210. Landow also communicated with the Management Defendants about the arbitrations and provision of medical reports by the PC Defendants.

211. A true and accurate copy of an e-mail chain between Landow, Mirzakandov, and Israilov (under the name "Roman Matatov")[2] discussing medical reports for Sovereign is depicted below:

---

[2] Per the indictment in *USA v. Gulkarov*, 1:22-cr-00020-PGG (S.D.N.Y.), Israilov went by the alias "Roman Matatov."



212.    On November 1, 2023, Israilov pleaded guilty to two counts of conspiracy to commit healthcare fraud and aggravated identity theft. *Gulkarov*, 22cr20, at ECF No. 356 ("Israilov Plea").

213.    Israilov admitted that, from 2014 to approximately 2021, he began working for a group of clinic controllers who improperly controlled certain medical clinics and pharmacies. Israilov Plea at pp. 20:18-20, 22:19-24.

214.    Israilov admitted that he and others "arranged for medical practitioners to prescribe medically unnecessary medical treatments, medically unnecessary durable medical equipment, and medically unnecessary medications, including topical creams and topical gels." *Id.* at p. 23:10-18.

215.    Israilov admitted that he and his co-conspirators used motor vehicle accident victim information to "fraudulently bill other insurance companies for services and procedures billed for by our no-fault medical clinics." *Id.* at p. 21:17-19.

216.    Israilov further admitted that he shared in the profits generated by this fraudulent scheme even though he knew that the clinics were not lawfully eligible to receive No-Fault payments under New York law because the clinic controllers, and not a licensed healthcare professional, controlled the clinics. *Id.* at p. 21:1-6.

217.    Israilov admitted that he concealed the receipts of the proceeds of the healthcare fraud scheme(s) by laundering payments from the clinics, charging the clinic phony marketing fees through a shell company, and arranging for checks to be cashed at shell check cashing companies under his or his co-conspirators' control. *Id.* at p. 24:11-22.

218.    Furthermore, all billing for the PC Defendants was handled by GreenBills LLC ("GreenBills"), which, per the agreement between GreenBills and Landow, took a percentage of all collections received by the PC Defendants as the "fee" for the aforementioned billing services.

219.    Billing service agreements that provide for the billing entity to collect a portion of professional medical corporation profits constitute unlawful fee-splitting, and are not permitted under New York law.

220.    GreenBills advertises itself as maintaining a "PIP, No-Fault, and Workers Compensation referral network" that "allows [providers] to create a private, secure network (group) of medical specialists, law firms, attorneys, and facilities like surgical centers and MRI facilities" to "refer patients within the group."

221.    Its subsidiary, TrakCharts, likewise advertises the ability to "[c]reate your own network of doctor [*sic*] and physicians that you work with to give quality care to your patients,"

and touts its ability to "streamline[] care delivery, patient engagement and business management workflows."

222.    Such a referral network, when compensation is exchanged between the providers, violates the New York Public Health Laws.

223.    On information and belief, GreenBills is a "shell" company used by laypersons involved in Landow's referral network to covertly siphon additional profits from the PC Defendants.

224.    Landow, likewise, did not provide the funding to launch his PCs or purchase any necessary equipment.

225.    Instead, the Management Defendants invested millions of dollars into the PC Defendants in return for the ability to control patient treatment and implement a predetermined, inflated billing protocol.

226.    Mirzakandov has testified under oath that he provided approximately $1.5 million in funding to the PC Defendants in partnership with Levy and Israilov.

227.    A true and accurate copy of Mirzakandov's deposition testimony ("Mirzakandov Depo.") on this topic is depicted below:

```
23              Q      Okay.   Now you indicated
24        globally.   Can you estimate, globally, how
25        much you have funded P.C. defendants in
```

```
1                    U. MIRZAKANDOV
2    this action?  How much money all of your
3    funding companies have given to the P.C.
4    defendants?
5         A    Approximately 1.5 mil.
```

Mirzakandov Depo. at pp. 53:23-25, 54:2-5.

228.    Levy confirmed that he and Mirzakandov co-owned multiple funding companies that provided approximately $1.5 million in funding to the PC Defendants.

229.    A true and accurate copy of Levy's deposition testimony ("Levy Depo.") on this topic is depicted below:

```
24              Q    Can you estimate, generally,
25    between all of the entities that you
```

```
1                       R. LEVY
2    provide funding through, all the entities
3    you're here for today, can you estimate
4    how much money you have provided to the PC
5    defendants in funding?
6         A    Well, I think, around
7    1.5 million, 1.4 million, in that range.
8         Q    And that's between all of the
9    entities that we're discussing today.
10   Correct?
11        A    Yes.
```

Levy Depo. at pp. 40:24-25, 41:2-11.

230.    Levy further testified that he "helped" the doctor at one of his professional physical therapy corporations, despite not being licensed to practice physical therapy.

231.    A true and accurate copy of Levy's deposition testimony on this topic is depicted below:

```
12          A    Well, I was helping there.  I
13    was trying to understand how it works.
14    I -- I did a little bit of bookkeeping.  I
15    helped with the doctor.
16          Q    And why were you trying to
17    understand how it works?
18          A    I wanted to learn how this
19    business works.
20          Q    When you say, "this business,"
21    what are you referring to?
22          A    Physical therapy.
23          Q    Are you a licensed physical
24    therapist?
25          A    [Unintelligible response.]
```

Levy Depo. at p. 97:12-25.

232.    Landow, meanwhile, improperly used his share of the profits generated by the PC Defendants to his own personal benefit, covertly siphoning profits to his girlfriend, non-party Joni Wilkins ("Wilkins").

233.    Bank records for the PC Defendants contain several large transfers to Wilkins and her company, Designcore, amounting to at least $1,139,888.00 over time.

36

234.    Landow also "employed" Wilkins as a W2 employee of Paramount, despite Wilkins never actually acting as an "employee" of the company.

### 3.    Landow's Failure to Practice Medicine Through the PC Defendants

235.    New York Business Corporation Law § 1507 provides that, for a professional medical corporation to be properly licensed, the shareholder must practice medicine through the professional corporation

236.    Landow has not practiced medicine through the PC Defendants as required by New York law.

237.    Instead, all treatment rendered by the PC Defendants is performed by physicians' assistants and/or independent contractors.

238.    Allstate's review of the billing documents and medical reports submitted by the PC Defendants has revealed that Landow is virtually never listed as the treating doctor on any records.

239.    In fact, several of the bills submitted to Allstate contained errors and/or factually inaccurate information.

240.    For example, the majority of bills submitted to Allstate by Macintosh listed the treating provider as Viviane Etienne, M.D., whereas the medical reports listed the treating provider as a physician's assistant.

241.    Furthermore, Landow resides in Florida for at least six (6) months out of the year, and is therefore unable to physically supervise any of the services rendered by the PC Defendants.

242.    Landow testified in his EUO, conducted by Allstate in August 2020, that he had not physically treated patients at Macintosh Medical since approximately February 2020 because of the pandemic. However, in previous insurance investigations conducted prior to 2020, Landow

still testified that he was rarely, if ever, physically present at the clinics from which the PC Defendants purported to treat patients.

243.    This suggests that Landow's failure to practice medicine through his PCs is a longstanding problem, and that his refusal to travel to New York in 2020 based on the pandemic was merely a convenient excuse for his absence.

**C.    FRAUDULENT TREATMENT PROTOCOL**

244.    As a crucial part of this scheme, the PC Defendants rendered and then sought payment for fraudulent treatments, tests, and services provided to patients.

245.    Indeed, Landow, Etienne, and the Management Defendants intentionally designed this scheme to operate from a variety of "multi-disciplinary" clinics to ensure that patients were subjected to numerous treatments for prolonged periods regardless of whether the patients needed—or even wanted—these services.

246.    The PC Defendants were not entitled to No-Fault reimbursement for these treatments, tests, and services, because they were excessive, medically unnecessary, and rendered pursuant to a pre-determined treatment protocol for the primary purpose of collecting payments from Allstate.

247.    The documents and invoices created and submitted by Allstate by (or on behalf of) the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically reasonable manner.

248.    As alleged herein, not only has this scheme injured Allstate, but the defendants' purposeful provision of excessive and clinically unwarranted care also compromised the well-being of the patients that were subjected to these grossly unnecessary treatments, tests, and services.

249.    Because of the misconduct described below, none of the PC Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

1.    **Predetermined Physical Therapy, Chiropractic, and Acupuncture Treatment Protocol**

250.    To generate as much billing as possible, Landow, Etienne, and the Management Defendants devised and implemented a protocol of excessive treatment over a prolonged period of time—treatment that was not medically indicated for the PC Defendants' patients, especially where the patients were only suffering from soft-tissue injuries caused by minor motor vehicle accidents.

251.    Indeed, the treatment records of Allstate claimants treating with one or more of the PC Defendants, when viewed as a whole, reveal an unmistakable and egregious pattern of over-treatment.

252.    The pattern of treatment instituted at each of these clinics typically commenced with the Allstate Claimant presenting at that particular location's anchor PC.

253.    Allstate Claimants were then referred to the PC Defendants for physician or pain management services, including initial and follow-up evaluations, trigger point injections (TPIs), TPII, and/or LINT.

254.    The initial and follow-up evaluations were invariably utilized to refer patients for additional physical therapy, chiropractic, and acupuncture treatment at the host clinic, thereby ensuring that each patient generated as much billing for the clinic owners as possible.

255.    Each examination concluded with the examining PA reporting an identical plan of care for each patient, including physical therapy treatment three (3) to four (4) times a week for four (4) to six (6) weeks followed by a reassessment.

256.    These subsequent reassessments regularly came to the same conclusion—i.e., that further physical therapy treatment was needed three (3) to four (4) times a week for four (4) to six (6) additional weeks.

257.    These identical treatment plans caused Allstate Claimants to receive physical therapy treatment at the referring clinic several times per week for months on end.

258.    Typically, the initial and follow-up evaluations would also refer patients for chiropractic and/or acupuncture treatment, as well as TPIs and a functional capacity assessment.

259.    Overall, the continued conservative care over extended periods of time—often with simultaneous chiropractic and physical therapy services treating the same body parts—is excessive, and not medically necessary for the management of patients' soft-tissue sprains and strains.

260.    To the extent that Allstate paid the PC Defendants in reliance on the documents created and submitted to Allstate by the PC Defendants in connection with any physical therapy treatments and services, chiropractic treatments and services, acupuncture treatments and services, and patient examinations and consultations used to justify the performance of excessive, medically unnecessary, and concurrent physical therapy, chiropractic care, and/or acupuncture care including, but not limited to, those payments listed in Exhibits 12-22, Allstate is entitled to recover all payments made to the PC Defendants in connection with any such services.

261.    Additionally, to the extent that any of the PC Defendants' charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault Law.

## 2.  **Medically Unnecessary Electrodiagnostic Studies**

262.    As part of their protocol, the PC Defendants incorporated electrodiagnostic ("EDX") testing services, such as electromyography ("EMG") studies and nerve conduction velocity ("NCV") studies.

263.    NCV studies are non-invasive studies in which peripheral nerves are stimulated with electrical current.

264.    NCV studies include "F-Wave" and "H-Reflex" studies.

265.    EMG tests measure the electrical activity of muscles, and are often performed in connection with NCV studies.

266.    An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

267.    EDX testing must never follow a predetermined protocol.  The decision of which nerves and muscles to test in each limb should be tailored to each patient's unique circumstances, and to their unique EDX findings.

268.    In a legitimate clinical setting, the decision of which nerves to study for each patient is based on (a) an evaluation of the patient's history, (b) a detailed neurologic examination of the patient, and (c) the "real time" results obtained during the actual tests.

269.    For example, if an abnormality is found during the tests, further investigation should be undertaken to determine the exact nature of the abnormality and the scope of the problem in terms of the number of nerves involved.

270.    Moreover, the nerves and muscles chosen for EDX testing must depend on each patient's specific complaints, physical examination findings, and prior EDX findings.

271.    In other words, the nature and extent of EDX testing should never be the same for every patient.

272.    The PC Defendants routinely performed EMG and NCV studies below the accepted standard of care.

273.    The PC Defendants selected muscles and nerves for EMG and NCV testing based on a protocol approach, rather than a dynamic approach based on individual patient symptoms.

274.    Each treating physician routinely sampled the same protocol list of muscles and nerves, which can lead to an improper diagnosis and put the patient at risk of inappropriate treatment.

275.    The PC Defendants also failed to extend their EDX studies when an initial screening test detected possible abnormalities, such as evidence of radiculopathy or conduction blocks.

276.    It is standard practice to sample five (5) muscles for a screening EMG, and, if abnormalities are found, the study is extended to test additional muscles to pinpoint the exact level of the radiculopathy.

277.    The PC Defendants not only failed to sample additional muscles upon a finding of potential radiculopathy, but also failed to sample the required minimum of five (5) limb muscles.

278.    Several studies conducted by the PC Defendants sampled only four (4) limb muscles, despite billing for these studies as full, five-limb studies.

279.    Furthermore, these studies made inappropriate diagnoses of multi-level radiculopathy where such a diagnosis was unsupported and improperly reported.

280.    Similarly, it is standard practice to sample five (5) nerves in a typical NCV study.

281.    The PC Defendants routinely sampled far more than five (5) nerves, regularly sampling ***over twenty (20)*** nerves per study.

282.    Such an extensive study is medically unnecessary, and poses a potential risk of unnecessary harm or pain to the patient.

283.    The results of the PC Defendants' EMG and NCV studies were never incorporated into patients' treatment plans or referenced in subsequent evaluations.

284.    The PC Defendants recommended and performed EDX testing (a) as a matter of routine rather than in response to each patient's unique exam findings, and (b) for the purpose of justifying further excessive and unnecessary pain management treatment—treatment that would generate additional revenue for the defendants.

285.    Throughout the course of this scheme, the PC Defendants deployed EDX testing without any basis in evidence-based guidelines and contrary to the standard of care.

286.    Deploying EDX testing in this manner suggests that the test results were never utilized to evaluate and assess each patient's condition.

287.    Such testing was therefore medically unnecessary.

288.    Not only was such EDX testing unnecessary, but it also (a) inflated the charges submitted to Allstate, and (b) placed the patients at additional and unwarranted physical risk of injury and infection.

289.    This clinically unnecessary EDX testing was fraudulent because the testing was utilized for the defendants' financial gain rather than for the individualized needs of the patients.

290.    Moreover, even if the EDX testing was warranted, the testing was still fraudulent because the results were misinterpreted and/or falsely utilized as support to justify the provision of additional, unnecessary treatment.

291.    Accordingly, because the EDX tests provided to the patients were excessive and not warranted by the condition of the patient, all of the charges submitted by the PC Defendants in connection with these tests are not compensable under New York's No-Fault Laws.

292.    Moreover, to the extent any of the charges submitted in connection with these EDX tests remain unpaid, Allstate is under no obligation to make any further payments to the PC Defendants in connection with those tests because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault Laws.

### 3.  Trigger Point Injections Under Medically Unnecessary Ultrasonic Guidance

293.    As a routine part of the PC Defendants' treatment protocol, patients underwent TPIs under ultrasonic guidance.

294.    TPIs can be useful in pain management practice.

295.    However, ultrasonic guidance is not medically necessary in the performance of TPIs.

296.    Trigger points are easily located by direct palpation, and injecting into a vascular structure can be avoided by the provider pulling back on the plunger before administering the injection.

297.    Trigger points are, in fact, not typically visible on ultrasounds, and, therefore, ultrasounds are largely useless in performing TPIs.

298.    Ultrasonic guidance, billed by the PC Defendants under CPT Code 76942, is medically unnecessary, and greatly increases the costs associated with TPI procedures.

299.    The Management Defendants routinely required the PC Defendants to employ ultrasonic guidance as part of each TPI not to enhance patient safety, but to further inflate billing for that procedure.

### 4.  **Medically Unnecessary LINT and TPII Treatment**

300.   As part of the PC Defendants' treatment protocol, patients were repeatedly provided medically unnecessary TPII and LINT services to generate massive bills to Allstate.

301.   TPII and LINT treatment are performed using a machine called the Nervomatrix Soleve.

302.    Alexander Buziashvili ("Buziashvili") was previously sued for renting out a Nervomatrix Soleve machine to medical providers at highly inflated prices so that those providers could incorporate medically useless LINT/TPII treatment into their treatment protocols. *See GEICO v. Chumaciero, et al.*, C.A. No. 1:20-cv-02220 (E.D.N.Y.).

303.   Buziashvili has acted as a co-conspirator with the Management Defendants in operating and controlling the Landow PCs.

304.   On information and belief, Buziashvili allowed the Management Defendants to continue this LINT/TPII scheme through the Landow PCs.

305.   The aforementioned LINT and TPII services were routinely billed by the PC Defendants under the "unlisted" CPT Code 99199.

306.   However, the appropriate CPT Codes for TPII and LINT services are CPT Codes 76942 and 97032, respectively—codes which are listed in the No-Fault fee schedule and encompass services that are functionally identical to LINT/TPII.

307.   Defendants instead chose to bill under an unlisted code to artificially inflate the charges for each procedure.

308.   Billing under CPT Code 99199 resulted in a reimbursement value of $2,455.00 per date of alleged service, as opposed to the listed codes, which would only result in a reimbursement value of approximately $300.00 for the same treatments.

309.    The impropriety of the approximately $2,455.00 charge per service is further demonstrated by the fact that TPII/LINT services using the Nervomatrix machine can be performed by an unlicensed technician in the span of a few minutes.

310.    Such services were then repeated multiple times per patient within a short timespan, without any explanation by the PC Defendants for the duplicative testing or any reason to suspect the patients' conditions had changed sufficiently to warrant reassessment.

311.    On average, TPII treatment is performed over the span of about six (6) sessions total.

312.    Providers should allow at least a week between TPII and LINT services to confirm whether the patient has tolerated the treatment.

313.    However, the PC Defendants routinely billed Allstate for services that were performed just days apart.

314.    It was excessive to bill Allstate for repeated TPII and LINT services without allowing the patients sufficient time to confirm that treatment was tolerated.

315.    Furthermore, there is no evidence that either TPII or LINT are medically necessary for the treatment of soft tissue injuries like those sustained by most of the PC Defendants' patients.

316.    Trigger points are areas of taut muscle bands or palpable knots of the muscle that are painful on compression.

317.    Trigger points are very easily identified through normal evaluations, including manual palpation, and TPII is not medically necessary to assess the presence of a trigger point.

318.    In addition, trigger points are routinely addressed with simple, inexpensive treatments, such as massage therapy, application of hot/cold packs, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and various other clinically useful methods.

319.    There is no evidence that LINT or TPII provide any therapeutic benefit beyond traditional methods of chiropractic treatment and/or physical therapy.

320.    Indeed, aside from being purportedly necessary for Nervomatrix machines to generate bills for unnecessary LINT treatments, the TPII measurements allegedly taken by the PC Defendants were not incorporated into any other aspect of patients' treatment plans.

321.    Every patient treated by the PC Defendants was already undergoing some combination of chiropractic, physical therapy, and/or acupuncture care at the referring clinics at the time LINT/TPII services were performed; each of these services already incorporates methods that address trigger points.

322.    Furthermore, the success of treatment can be determined based on the data generated by TPII, in that the number of potential trigger points should decrease over the course of treatment—this decrease indicates that treatment was successful.

323.    Despite this allegedly objective indicator of utility of treatment, the PC Defendants continued billing Allstate even when treatment was unsuccessful.

324.    In order to falsely justify the excessive and unnecessary TPII and LINT treatment billed to Allstate, the PC Defendants always diagnosed patients with myofascial pain syndrome with pain in either the thoracic or lumbar region, which are vague and non-specific diagnoses designed only to create the appearance of necessity for the treatment billed.

325.    Accordingly, to the extent that Allstate paid the PC Defendants in reliance on documents created and submitted to Allstate in connection with medically unnecessary TPII and LINT services, including, but not limited to, those payments listed in Exhibits 12-22, Allstate is entitled to recover all payments made in connection with any such services.

326.     To the extent that any of the PC Defendants' charges submitted in connection with medically unnecessary TPII and LINT services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions.

### 5.  Outcome Assessment Testing

327.     Patients treating with the PC Defendants routinely underwent "Outcome Assessments," which were billed under CPT Code 99358.

328.     These Outcome Assessment tests were multi-page questionnaires which the patients filled out describing their pain.

329.     The PC Defendants used at least two (2) versions of these questionnaires—one in English, and one in Spanish.

330.     However, these Outcome Assessment questionnaires did not use standardized outcome assessment tools, such as the Revised Oswestry Back Disability Questionnaire, the Roland-Morris Questionnaire, the Headache Disability Index, the Neck Disability Index Questionnaire, the Shoulder Pain and Disability Index, and/or the Subjective Knee Score Questionnaire.

331.     Scoring and tabulating a standard Outcome Assessment questionnaire can be accomplished by anyone in a physician's office in a matter of minutes.

332.     For this reason, when physicians utilize Outcome Assessment tools, they are typically included in the bill for the overall evaluation conducted on that date of service.

333.     The PC Defendants, however, routinely billed for both an office visit **_and_** an "Outcome Assessment" using separate CPT codes.

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 01/23/2018 | 82-25 Queens Blvd, Suite 1A, Elmhurst, NY 11373 | Office visit (follow up) | 99213 | $ 64.07 |
| 01/23/2018 | 82-25 Queens Blvd, Suite 1A, Elmhurst, NY 11373 | Outcome Assessment | 99358 | $ 204.41 |

**TOTAL CHARGES TO DATE  $ 268.48**

334.    There is __no__ CPT code that describes the procedure "Outcome Assessment."

335.    The PC Defendants' routine billing of the procedure using the separate CPT Code 99358 on the same date of service was inappropriate, as this code is used for the review of records on a __*different date*__ than a patient's primary evaluation and management service.

336.    Accordingly, to the extent that Allstate paid the PC Defendants in reliance on documents created and submitted to Allstate in connection with medically unnecessary Outcome Assessment services, including, but not limited to, those payments listed in Exhibits 12-22, Allstate is entitled to recover all payments made in connection with any such services.

337.    To the extent that any of the PC Defendants' charges submitted in connection with medically unnecessary Outcome Assessment services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions.

### 6. Treatment Rendered Pursuant to Unlawful Referral Arrangements

338.    Landow's involvement with several multi-disciplinary clinics with many different healthcare disciplines was both intentional and crucial to the financial success of his scheme because controlling all of these providers under the same roof allowed all providers operating from the clinic to cultivate symbiotic relationships between and establish unlawful referral arrangements among their professional corporations.

339.    As part of this scheme, each of the professional corporations operating from the clinics were caused to make referrals to the other PCs operating from that location, including the PC Defendants.

340.    These referrals resulted in additional treatment, which, in turn, caused additional bills to be created and then submitted to Allstate seeking No-Fault reimbursement.

341.    All of these claims and bills were furnished pursuant to an illegal arrangement through which Landow referred patients to-and-from professional healthcare corporations with which Landow had a financial relationship, thus rendering these claims and bills ineffective.

342.    Where applicable, the PC Defendants and Landow also did not properly disclose to the patients that financial relationships existed between the PC Defendants, the clinic owners, and Landow.

343.    The failure to disclose Landow's financial interests in the referrals was intentional.

344.    Indeed, any such disclosure would have revealed Landow's carefully concealed fraudulent scheme, and may have drawn questions from patients and insurers about the legitimacy of the referrals and the resulting treatment.

345.    Under New York law, Allstate has no obligation to pay any claims that arise from unlawful referral arrangements.

346.    Accordingly, to the extent that Allstate paid the PC Defendants in reliance on documents created and submitted to Allstate in connection with these unlawful referrals, including, but not limited to, those payments listed in Exhibits 12-22, Allstate is entitled to recover all payments made in connection with any such services.

347.    To the extent that any of the PC Defendants' charges submitted in connection with unlawful referrals remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions.

**D.  EXEMPLAR CLAIMS**

    **i.  Claimant A.O. (Claim No. 0493642771)**

348.    Patient A.O. (Claim No. 0493642771) was purportedly involved in a motor vehicle accident on February 26, 2018.

349.    A.O. initially presented for a pain management evaluation at ***Paramount*** on February 27, 2018.

350.    Upon presenting at Paramount, A.O. was purportedly examined by Angela Duque, M.D. ("Duque").

351.    Duque noted that A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, and left leg pain at the initial evaluation.

352.    Duque prescribed A.O. physical therapy, and recommended that A.O. follow up with the practice in four (4) weeks.

353.    Duque also performed an outcome assessment on A.O. at the initial appointment.

354.    Inexplicably, A.O. then underwent a ***follow-up*** evaluation at Paramount with Aleksandr Kopach, P.A. ("Kopach"), on the ***same date*** as the initial evaluation (February 27, 2018).

355.    Kopach prescribed A.O. physical therapy, a suprascapular nerve block, and trigger point injections.

356.    Kopach then administered a suprascapular nerve block and trigger point injection to A.O. on the same date of service.

357.    A.O. presented for another follow-up evaluation with Duque at Paramount on April 9, 2018.

358.    At this follow-up, Duque noted A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, left leg pain, and right knee pain.

359.    Duque prescribed A.O. continued physical therapy, and recommended that A.O. follow up with the practice in four (4) weeks.

360.    Duque also performed an outcome assessment on A.O.

361.    A.O. then presented for a follow-up evaluation with Kopach at Paramount on April 17, 2018.

362.    At this follow-up, Kopach noted A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, left leg pain, and right knee pain.

363.    Kopach prescribed A.O. continued physical therapy, a suprascapular nerve block, and trigger point injections.

364.    Kopach then administered a suprascapular nerve block and trigger point injection to A.O. on the same date of service.

365.    Kopach also performed an outcome assessment on A.O.

366.    A.O. presented for another follow-up evaluation with Kopach at Paramount on November 13, 2018.

367.    At this follow-up, Kopach noted that A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, left leg pain, right knee pain, and right arm pain.

368.    Kopach prescribed A.O. continued physical therapy, and performed an outcome assessment on A.O.

369.    A.O. then presented for another follow-up evaluation with Kopach at Paramount on December 28, 2018.

370.    At this follow-up, Kopach noted that A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, left leg pain, right knee pain, and right arm pain.

371.    Kopach prescribed A.O. continued physical therapy, a knee joint injection, a right common peroneal nerve injection, and a saphenous nerve injection.

372.    Kopach also performed an outcome assessment on A.O.

373.    A.O. then presented for a follow-up evaluation with Kopach at Paramount on February 5, 2019.

374.    At this follow-up, Kopach noted A.O. complained of headaches, cervical spine pain radiating to the right shoulder, lumbar spine pain, left leg pain, right knee pain, and right arm pain.

375.    Kopach prescribed A.O. continued physical therapy, a suprascapular nerve block, and trigger point injections.

376.    Kopach then administered a suprascapular nerve block and trigger point injection to A.O. on the same date of service.

377.    Kopach also performed an outcome assessment on A.O.

378.    A.O. then presented for another follow-up evaluation with Kopach at ***Birch*** on March 12, 2019.

379.    At this follow-up, Kopach noted A.O. complained of cervical spine pain radiating to the ***left*** shoulder (where, previously, A.O. complained of ***right*** shoulder pain), lumbar spine pain, and right knee pain.

380.     Kopach prescribed A.O. continued physical therapy, and performed an outcome assessment on A.O.

381.     On April 15, 2019, A.O. presented at **_Spruce_**, where A.O. was evaluated by Ravi Salickram, P.A. ("Salickram"), for complaints of **_right_** shoulder pain.

382.     Salickram recommended that A.O. undergo a right shoulder arthroscopy.

383.     The next day, on April 16, 2019, Kopach, through Paramount Medical, prescribed A.O. a fitted right shoulder brace.

384.     On April 26, 2019, A.O. underwent a right shoulder arthroscopy, which was performed by Paul Ackerman, M.D. (an employee of Spruce), at North Queens Surgical Center.

385.     A.O. then presented for a follow-up evaluation with Kopach at **_Birch_** on May 14, 2019.

386.     At this follow-up, Kopach recorded complaints of cervical spine pain radiating to the right shoulder, lumbar spine pain, and right arm pain.

387.     Kopach prescribed A.O. continued physical therapy three (3) to four (4) times per week for four (4) weeks.

388.     Kopach also performed an outcome assessment on A.O.

389.     A.O. then presented for a follow-up evaluation with Kopach at **_Eastern_** on July 9, 2019.

390.     At this follow-up, Kopach recorded complaints of cervical spine pain radiating to the right shoulder, lumbar spine pain, and right arm pain.

391.     Kopach prescribed A.O. continued physical therapy one (1) to two (2) times per week for four (4) weeks.

392.     Kopach also performed an outcome assessment on A.O.

393.    A.O. once again presented for a follow-up evaluation with Kopach at Eastern on September 10, 2019.

394.    At this follow-up, Kopach recorded complaints of mild cervical spine pain, lumbar spine pain, and right arm pain.

395.    Kopach also performed an outcome assessment on A.O.

396.    A.O. was then formally discharged from treatment.

397.    Despite multiple changes in treating entity, A.O. was subjected to the exact same course of treatment by the exact same providers at Birch, Eastern, Paramount, and Spruce.

398.    All treatment provided to A.O. was rendered at the multi-disciplinary clinic located at 82-25 Queens Boulevard, Elmhurst, New York 11373.

399.    A.O.'s treatment records contain no explanation as to why A.O. treated at four (4) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

400.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Birch, Eastern, Paramount, and Spruce, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to A.O.

401.    The documentation submitted to Allstate by the Defendants demonstrates that A.O. was subjected to excessive and medically unnecessary healthcare services from Birch, Eastern, Paramount, and Spruce during the relevant period.

### ii.   Claimant O.O. (Claim No. 0499979929)

402.    Patient O.O. (Claim No. 0499979929) was purportedly involved in a motor vehicle accident on April 20, 2018.

403.    O.O. initially presented for a pain management evaluation at **_Paramount_** on April 24, 2018.

404.    Upon presenting at Paramount, O.O. was purportedly examined by Aleksandr Kopach, P.A. ("Kopach").

405.    Kopach noted that O.O. complained of headaches with neck stiffness, cervical spine pain radiating to the bilateral shoulders, bilateral shoulder pain radiating to the chest, bilateral thoracic pain radiating to the chest, bilateral lumbar pain, and bilateral knee pain at the initial evaluation.

406.    Kopach prescribed O.O. physical therapy, and recommended a lumbar intraarticular facet steroid injection, and a trigger point injection.

407.    Kopach also performed an outcome assessment on O.O. at the initial appointment.

408.    Kopach then administered a lumbar facet injection and trigger point injection to O.O. on the same date of service.

409.    O.O. presented for a follow-up evaluation at Paramount on May 8, 2018, performed by Angela Duque, M.D. ("Duque").

410.    Duque noted that O.O. complained of headaches with neck stiffness, cervical spine pain radiating to the left and right shoulders, bilateral shoulder pain radiating to the chest, bilateral thoracic pain radiating to the chest, bilateral lumbar pain, and bilateral knee pain.

411.    Duque prescribed O.O. continued physical therapy, and performed an outcome assessment.

412.    On May 31, 2018, O.O. presented for a neurological consultation and EMG/NCV study at **_Preferred_**, performed by Opeoluwa Eleyinafe, M.D. ("Eleyinafe").

413.    Eleyinafe noted that O.O. purportedly complained of "neck pain and lower back pain radiating to the bilateral upper and lower extremities."

414.    None of the prior examinations of O.O. noted any complaints of radiating pain in the *lower* extremities.

415.    Eleyinafe's study, however, purportedly found evidence of bilateral L4-L5 radiculopathy.

416.    The invoice submitted to Allstate for the May 31, 2018 date of service billed for CPT Codes 99243-25 (Consultation), 95903 (NCV Motor Study F/Waves 8 Units), and 95904 (NCV Sensory 10 Units).

417.    With limited exceptions, the American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM) prohibits billing for an EDX study and an evaluation/consultation on the same date of service, as the EDX codes include the limited evaluation and history needed for the performance of the study.

418.    Billing for a consultation on the same date of service as the EDX study amounts to fraudulent billing whereas the service was already included in the EDX charges.

419.    Furthermore, Eleyinafe sampled at least eighteen (18) nerves, which is far in excess of the standard of care, which calls for a sampling of no more than five (5) nerves.

420.    O.O. presented for another follow-up evaluation at ***Paramount*** on July 3, 2018, performed by Kopach.

421.    Kopach noted that O.O. complained of headaches with neck stiffness, cervical spine pain radiating to the left and right shoulders, bilateral shoulder pain radiating to the chest, bilateral thoracic pain radiating to the chest, bilateral lumbar pain, and bilateral knee pain.

422.    Kopach prescribed O.O. continued physical therapy three (3) to four (4) times a week for four (4) weeks, and recommended a lumbar intraarticular facet steroid injection and a trigger point injection.

423.    Kopach then administered a paravertebral facet injection and trigger point injection to O.O. on the same date of service.

424.    Kopach also performed an outcome assessment.

425.    On December 13, 2018, O.O. presented for LINT/TPII testing at ***Sovereign*** performed by Etienne.

426.    O.O. presented for a follow-up evaluation at ***Birch*** on June 11, 2019, performed by Kopach.

427.    Kopach noted that O.O. complained of cervical spine pain, bilateral thoracic pain, bilateral lumbar pain, and bilateral knee pain.

428.    Kopach prescribed O.O. continued physical therapy three (3) to four (4) times a week for four (4) weeks, and recommended a trigger point injection.

429.    Kopach then administered a trigger point injection to O.O. on the same date of service.

430.    Kopach also performed an outcome assessment.

431.    Despite multiple changes in treating entity, O.O. was subjected to the exact same course of treatment by the exact same providers at Birch, Paramount, Preferred, and Sovereign.

432.    The majority of treatment provided to O.O. was rendered at the multi-disciplinary clinic located at 82-25 Queens Boulevard, Suite 1A, Elmhurst, New York 11373.

433.    O.O.'s EMG/NCV study by Preferred was purportedly performed at 174 W. 4th Street, Suite 324, New York, New York 10014—however, this address is affiliated with a USPS office, rather than a medical facility.

434.    O.O.'s LINT/TPII services by Sovereign was purportedly performed at the multi-disciplinary facility at 513 Church Avenue, Brooklyn, New York 11218.

435.    O.O.'s treatment records contain no explanation as to why O.O. treated at four (4) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

436.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Birch, Paramount, Preferred, and Sovereign, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to O.O.

437.    The documentation submitted to Allstate by the Defendants demonstrates that O.O. was subjected to excessive and medically unnecessary healthcare services from Birch, Paramount, Preferred, and Sovereign during the relevant period.

### iii.  **Claimant J.T. (Claim No. 0511262552)**

438.    Patient J.T. (Claim No. 0511262552) was purportedly involved in a motor vehicle accident on January 28, 2018.

439.    J.T. initially presented for a pain management evaluation at ***Paramount*** on August 7, 2018.

440.    Upon presenting at Paramount, J.T. was purportedly examined by Etienne.

441.    Etienne noted that J.T. complained of headaches, cervical spine pain radiating to the chest, bilateral shoulder pain radiating to the right hand, bilateral thoracic pain, bilateral lumbar

pain radiating to the bilateral hips and buttocks, bilateral knee pain radiating down both legs, and bilateral hip pain radiating to the legs at the initial evaluation.

442.    The initial report also, contradictorily, notes: "There is neck stiffness. There is no neck stiffness."

443.    Etienne prescribed J.T. physical therapy.

444.    Etienne also performed an outcome assessment on J.T. at the initial appointment.

445.    Just *two days* later, J.T. presented for a follow-up evaluation at Paramount on August 9, 2018, performed by Aleksandr Kopach, P.A. ("Kopach").

446.    Kopach noted that J.T. complained of headaches, cervical spine pain radiating to the chest, bilateral shoulder pain radiating to the right hand, thoracic pain, lumbar pain radiating to the bilateral hips, bilateral knee pain radiating to the legs, and bilateral hip pain radiating to the legs.

447.    Kopach prescribed J.T. continued physical therapy, and performed an outcome assessment.

448.    On September 6, 2018, J.T. presented for a neurological consultation and EMG/NCV study at **_Preferred_**, performed by Joseph Raia, M.D. ("Raia").

449.    Raia noted that J.T. purportedly complained of neck pain radiating to the bilateral extremities, and low back pain radiating to the bilateral lower extremities.

450.    Raia's study purportedly found no evidence of radiculopathy or neuropathy at the cervical or lumbar level.

451.    The invoice submitted to Allstate for the September 6, 2018 date of service billed for CPT Codes 99243-25 (Consultation), 95903 (NCV Motor Study F/Waves 8 Units), and 95904 (NCV Sensory 10 Units).

452.    Billing for a consultation on the same date of service as the EDX study constitutes fraudulent billing because the service was already included in the EDX charges.

453.    Furthermore, the study sampled approximately eighteen (18) nerves, which far exceeds the standard of care for an average NCV study, wherein a standard sampling is five (5) nerves.

454.    J.T. presented for another follow-up evaluation at Paramount on September 20, 2018, performed by Kopach.

455.    Kopach noted that J.T. complained of headaches, cervical spine pain radiating to the chest, bilateral shoulder pain radiating to the right hand, thoracic pain, lumbar pain radiating to the bilateral hips, bilateral knee pain radiating to the legs, and bilateral hip pain radiating to the legs.

456.    Kopach prescribed J.T. continued physical therapy three (3) to four (4) times per week for four (4) weeks, and recommended a lumbar intraarticular facet steroid injection, and a trigger point injection.

457.    Kopach also performed an outcome assessment.

458.    On September 27, 2018, J.T. presented for a neurological consultation at Preferred, performed by Eric Kenworthy, M.D. ("Kenworthy").

459.    Kenworthy recommended that J.T. continue physical therapy treatment.

460.    J.T. presented for a pain management evaluation at Preferred on October 2, 2018, performed by Robert Riselvato, P.A. ("Riselvato").

461.    Riselvato noted that J.T. complained of constant right knee pain.

462.    Riselvato noted that J.T. wished to pursue conservative treatment, rather than an arthroscopy, at that time.

463.    J.T. presented for another follow-up evaluation at **_Paramount_** on October 25, 2018, performed by Kopach.

464.    Kopach noted that J.T. complained of headaches, cervical spine pain radiating to the chest, bilateral shoulder pain radiating to the right hand, thoracic pain, lumbar pain radiating to the bilateral hips, bilateral knee pain radiating to the legs, and bilateral hip pain radiating to the legs.

465.    Kopach prescribed J.T. continued physical therapy three (3) to four (4) times per week for four (4) weeks, and recommended a lumbar intraarticular facet steroid injection, and a trigger point injection.

466.    Kopach also performed an outcome assessment.

467.    J.T. presented for another follow-up evaluation at Paramount on November 29, 2018, performed by Kopach.

468.    Kopach noted that J.T. complained of headaches, cervical spine pain radiating to the chest, bilateral shoulder pain radiating to the right hand, thoracic pain, lumbar pain radiating to the bilateral hips, bilateral knee pain radiating to the legs, and bilateral hip pain radiating to the legs.

469.    Kopach prescribed J.T. continued physical therapy three (3) to four (4) times per week for four (4) weeks, and recommended a trigger point injection.

470.    Kopach also performed an outcome assessment.

471.    J.T. presented for another follow-up evaluation at Paramount on January 3, 2019, performed by Kopach.

472.    Kopach noted that J.T. complained of occasional headaches, cervical spine pain radiating to the "spins" [sic], lumbar pain radiating to the bilateral hips, and bilateral knee pain.

473.    Kopach prescribed J.T. continued physical therapy three (3) to four (4) times per week for four (4) weeks, and recommended a knee joint injection, right common peroneal nerve injection, and saphenous nerve injection.

474.    Kopach also performed an outcome assessment.

475.    J.T. presented for another follow-up evaluation at Paramount on February 7, 2019, performed by Kopach.

476.    Kopach noted that J.T. complained of infrequent bilateral shoulder pain, and infrequent bilateral knee pain.

477.    Kopach prescribed J.T. continued physical therapy three (3) to four (4) times per week for four (4) weeks, and performed an outcome assessment.

478.    J.T. presented for another follow-up evaluation at ***Birch*** on April 11, 2019, performed by Kopach.

479.    Kopach noted that J.T. complained of minor bilateral shoulder pain.

480.    Kopach performed an outcome assessment, and formally discharged J.T.

481.    Throughout the months of September through November, J.T. presented for LINT/TPII testing at ***Sovereign***, performed by Etienne.

482.    J.T. underwent at least ***ten (10)*** LINT/TPII studies between September 25, 2018, and November 2, 2018.

483.    Several of these studies took place only days apart.

484.    Each LINT/TPII study found evidence of thoracic spine and myofascial pain syndrome.

485.    Despite multiple changes in treating entity, J.T. was subjected to the exact same course of treatment by the exact same providers at Birch, Paramount, Preferred, and Sovereign.

486.    The majority of treatment provided to J.T. was rendered at the multi-disciplinary clinic located at 332 East 149th Street, Bronx, New York 10451.

487.    J.T.'s LINT/TPII services by Sovereign was purportedly performed at the multi-disciplinary facility at 513 Church Avenue, Brooklyn, New York 11218.

488.    J.T.'s treatment records contain no explanation as to why J.T. treated at four (4) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

489.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Birch, Paramount, Preferred, and Sovereign, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.T.

490.    The documentation submitted to Allstate by the Defendants demonstrates that J.T. was subjected to excessive and medically unnecessary healthcare services from Birch, Paramount, Preferred, and Sovereign during the relevant period.

### iv.    Claimant K.B. (Claim No. 0529969964)

491.    Patient K.B. (Claim No. 0529969964) was purportedly involved in a motor vehicle accident on December 14, 2018.

492.    K.B. initially presented for physical therapy treatment at ***Preferred*** on December 17, 2018.

493.    Upon presenting at Preferred Medical, K.B. was purportedly examined by Abdu Metwally, R.P.T. ("Metwally").

494.    Metwally noted low back pain, right hip pain, and right knee pain during the initial examination.

495.    Metwally recommended that K.B. continue physical therapy treatment three (3) to four (4) times per week for the next four (4) weeks.

496.    K.B. also initially presented for acupuncture treatment at ***Sovereign*** on December 17, 2018.

497.    Upon presenting at Sovereign, K.B. was purportedly examined by You Jun Ren, L.Ac. ("Ren").

498.    Ren noted bilateral lower back pain, right hip pain, and right knee pain during the initial examination.

499.    Ren recommended that K.B. continue acupuncture treatment three (3) to four (4) times per week for the next six (6) to eight (8) weeks.

500.    On January 10, 2019, K.B. presented for a neurological consultation and EMG/NCV study at ***Preferred***, performed by Eric Kenworthy, M.D. ("Kenworthy").

501.    Kenworthy noted that K.B. purportedly complained of "neck pain and back pain radiating to the upper and lower extremities."

502.    None of the prior examinations of K.B., at either Preferred or Sovereign, noted any complaints of radiating pain.

503.    Kenworthy's study, however, purportedly found evidence of left ulnar motor and right tibial motor neuropathy.

504.    In connection with this EMG/NCV study and neurological consultation, Preferred submitted two (2) separate bills to Allstate, both for the same dates of service and at the same treatment address.

505.    The first bill contained CPT Codes 99202 (Initial Evaluation Level II), 95903 (NCV Motor Study with F Waves), 95904 (NCV Sensory Study), 95934 (H-Reflex Study), and 95886 (EMG 4 Extremities).

506.    The second bill contained CPT Codes 99243-25 (Consultation), 95903 (NCV Motor Study with F Waves), 95904 (NCV Sensory Study), 95934 (H-Reflex Study), and 95864 (EMG 4 Extremities).

507.    Inexplicably, these bills reflect the same treatment (a consultation and EMG/NCV study) by the same treating provider (Kenworthy) on the same date of service (January 10, 2019), but contain slightly different CPT Codes, and provide different billing addresses for Preferred.

508.    These bills also inappropriately charged separately for the neurological consultation (using CPT code 99243-25) and the EDX studies (CPT codes 95903, 95904, 95934, and 95864), when the costs of evaluation are included in the costs of EDX testing.

509.    Furthermore, the EMG study sampled only four (4) extremities, whereas the standard practice for a screening EMG is to sample a minimum of five (5) extremities to test for abnormalities.

510.    Following the purported EMG/NCV study, Kenworthy recommended that K.B. continue his course of physical therapy treatment, but provided no guidelines as to the frequency or duration of treatment.

511.    K.B. continued treatment with Preferred and Sovereign through February 2019, at which time his physical therapy treatment switched to ***Spruce***.

512.    Despite the change in treating entity, K.B. was subjected to the exact same course of treatment by the exact same providers at Spruce as he was at Preferred.

513.     All treatment provided to K.B. was rendered at the multi-disciplinary clinic located at 3910 Church Avenue, Brooklyn, New York 11203.

514.     While K.B. was undergoing physical therapy and acupuncture treatment with Preferred, Sovereign, and Spruce, K.B. purportedly underwent simultaneous physical therapy treatment with other non-party providers operating from the Church Avenue clinic.

515.     The medical records for K.B. contain no explanation as to why K.B. received physical therapy from multiple entities on the same dates of service.

516.     These records, likewise, contain no explanation as to why K.B. treated at three (3) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

517.     In connection with the treatment purportedly rendered to the claimant, the Defendants, through Preferred, Sovereign, and Spruce, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to K.B.

518.     The documentation submitted to Allstate by the Defendants demonstrates that K.B. was subjected to excessive and medically unnecessary healthcare services from Preferred, Sovereign, and Spruce during the relevant period.

**v.   Claimant C.L. (Claim No. 0532519931)**

519.     Patient C.L. (Claim No. 0532519931) was purportedly involved in a motor vehicle accident on January 25, 2019.

520.     C.L. initially presented for acupuncture treatment at ***Sovereign*** on January 29, 2019.

521.    Upon presenting at Sovereign, C.L. was purportedly examined by You Jun Ren, L.Ac. ("Ren").

522.    Ren noted that C.L. complained of neck, upper back, and lower back pain during the initial examination.

523.    Ren recommended that C.L. continue acupuncture treatment and cupping.

524.    C.L. initially presented for physical therapy treatment at ***Preferred*** on January 30, 2019.

525.    Upon presenting at Preferred, C.L. was purportedly examined by Mohamed Elmansy, P.T. ("Elmansy").

526.    Elmansy noted that C.L. complained of lower back pain without radiation during the initial examination.

527.    Elmansy recommended that C.L. continue physical therapy treatment.

528.    C.L. continued physical therapy treatment at Preferred until February 4, 2019.

529.    Then, on February 5, 2019, C.L. began undergoing physical therapy treatment with ***Spruce***.

530.    Notably, this treatment involved the exact same modalities and exact same treating providers.

531.    Despite the change in treating entity, C.L.'s course of physical therapy treatment remained otherwise completely unchanged.

532.    On February 19, 2019, C.L. presented for a neurological consultation and EMG/NCV study at Spruce, performed by Joseph Raia, M.D. ("Raia").

533.    However, none of the prior examinations of C.L., at either Preferred, Sovereign, or Spruce, noted any complaints of radiating pain.

534.    The bill for this date of service included CPT codes 99202 (Initial Evaluation Level II), 95904 (NCV Sensory Study 10 Units), 95934 (H-Reflex Studies 2 Units), 95903 (NCV Motor Study with F Waves 8), and 95886 (EMG 4 Extremities).

535.    This bill inappropriately charged separately for the evaluation (using CPT code 99202) and the EDX studies (CPT codes 95903, 95904, 95934, and 95886), when the costs of evaluation are included in the costs of EDX testing.

536.    The NCV study sampled at least twenty (20) nerves, whereas the standard of care for an average NCV study is to sample only (5) nerves.

537.    Furthermore, the EMG study sampled only four (4) extremities, whereas the standard practice for a screening EMG is to sample a minimum of five (5) extremities to test for abnormalities.

538.    All treatment provided to C.L. was rendered at the multi-disciplinary clinic located at 3910 Church Avenue, Brooklyn, New York 11203.

539.    While C.L. was undergoing physical therapy and acupuncture treatment with Preferred, Sovereign, and Spruce, C.L. purportedly underwent simultaneous physical therapy treatment with other non-party providers operating from the Church Avenue clinic.

540.    The medical records for C.L. contain no explanation as to why C.L. received physical therapy from multiple entities on the same dates of service.

541.    These records, likewise, contain no explanation as to why C.L. treated at three (3) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

542.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Preferred, Sovereign, and Spruce, submitted documentation to Allstate,

through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to C.L.

543.    The documentation submitted to Allstate by the Defendants demonstrates that C.L. was subjected to excessive and medically unnecessary healthcare services from Preferred, Sovereign, and Spruce during the relevant period.

### vi.    Claimant T.W. (Claim No. 0545919896)

544.    Patient T.W. (Claim No. 0545919896) was purportedly involved in a motor vehicle accident on May 17, 2019.

545.    T.W. initially presented for a pain management evaluation at ***Spruce*** on June 25, 2019.

546.    Upon presenting at Spruce, T.W. was purportedly examined by Annisha Creary, P.A. ("Creary").

547.    Creary noted that T.W. complained of left shoulder pain and left knee pain at the initial evaluation.

548.    Creary scheduled T.W. for a left shoulder arthroscopy on July 19, 2019.

549.    On July 19, 2019, T.W. presented at ***Eastern*** for a pre-surgery evaluation and a left shoulder arthroscopy.

550.    The medical report for the July 19, 2019 evaluation notes that Eastern received a referral for the surgery from Spruce.

551.    Following the arthroscopy, T.W. presented for a post-op follow-up at Eastern.

552.    T.W.'s treatment at both Spruce and Eastern was rendered at the multi-disciplinary clinic located at 430 West Merrick Road, Valley Stream, New York 11580.

553.    T.W.'s treatment records contain no explanation as to why T.W. treated at two (2) separate entities, both purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

554.    T.W.'s treatment records also contain no evidence that any disclosure of common ownership between Spruce and Eastern was made to T.W. in connection with T.W.'s referral for surgery.

555.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Eastern and Spruce, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to T.W.

556.    The documentation submitted to Allstate by the Defendants demonstrates that T.W. was subjected to excessive and medically unnecessary healthcare services from Eastern and Spruce during the relevant period.

### vii.   Claimant L.E. (Claim No. 053442898)

557.    Patient L.E. (Claim No. 053442898) was purportedly involved in a motor vehicle accident on July 11, 2019.

558.    L.E. initially presented for a neurological consultation and EMG/NCV study at *__Summit__* on August 2, 2019, performed by Joseph Raia, M.D. ("Raia").

559.    At this consultation, Raia noted that L.E. complained of neck pain without radiation, and lower back pain radiating to the right lower extremity.

560.    This study found evidence of peripheral neuropathy affecting the bilateral sural sensory nerves, and superficial peroneal sensory nerves and tibial motor nerves.

561.    The bill for this date of service included CPT codes 99203 (Office Consultation), 95861 (EMG Lower 2 Extremities & Paraspinal Areas), 95903 (NCV Motor F-Wave 4 Nerves), NCV Sensory 4 Nerves), and 95934 (H Reflex Study 2 Nerves).

562.    This bill inappropriately charged separately for the evaluation (using CPT code 99203) and the EDX studies (CPT codes 95903, 95934, and 95861), when the costs of evaluation are included in the costs of EDX testing.

563.    L.E. subsequently presented for a pain management evaluation at *__Macintosh__* on May 18, 2020, performed by Wei Hong Xu, N.P. ("Xu").

564.    Xu noted that L.E. was "transferring from previous provider" and was "[h]ere to continue PT/treatment."

565.    The evaluation was billed under CPT Code 99203, reflecting a "new patient" evaluation.

566.    Xu also noted that L.E. complained of right knee pain and bilateral lumbar spine pain.

567.    Xu prescribed L.E. physical therapy three (3) to four (4) times per week for four (4) to six (6) weeks, and recommended that L.E. follow up with the practice in four (4) weeks.

568.    L.E. presented for a follow-up evaluation at Macintosh on June 9, 2020, performed by Xu.

569.    Xu noted that L.E. complained only of rare, mild lumbar spine pain.

570.    Xu performed an outcome assessment, and formally discharged L.E. from treatment.

571.    All treatment provided to L.E. was rendered at the multi-disciplinary clinic located at 3910 Church Avenue, Brooklyn, New York 11203.

572.    L.E.'s treatment records contain no explanation as to why L.E. treated at two (2) separate entities, both purportedly owned by the same individual and operating from the same treatment facility, during the same course of treatment.

573.    L.E.'s records, likewise, do not explain why L.E. underwent an "initial" evaluation at Macintosh several months after treating with Summit, and after treating with other physical therapy providers operating from the exact same facility.

574.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Macintosh and Summit, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to L.E.

575.    The documentation submitted to Allstate by the Defendants demonstrates that L.E. was subjected to excessive and medically unnecessary healthcare services from Macintosh and Summit during the relevant period.

**viii.   Claimant M.V. (Claim No. 0448237370)**

576.    Patient M.V. (Claim No. 0448237370) was purportedly involved in a motor vehicle accident on March 4, 2017.

577.    M.V. initially presented for a pain management evaluation at ***Paramount*** on March 21, 2017.

578.    Upon presenting at Paramount, M.V. was purportedly examined by Jordan Fersel, M.D. ("Fersel").

579.    Fersel noted that M.V. complained of headaches, neck pain with numbness/tingling in the left upper extremity, and lower back pain at the initial evaluation.

580.    Fersel prescribed M.V. physical therapy, as well as an MRI of the cervical and lumbar spine.

581.    Fersel also performed a trigger point injection under ultrasonic guidance at this evaluation.

582.    On April 26, 2017, M.V. presented at **_Urban_** for a neurodiagnostic evaluation and EMG/NCV study, performed by Elizabeth Kulesza, M.D. ("Kulesza").

583.    During the evaluation, Kulesza noted that M.V. complained of cervical and lumbar spine pain, with radiation to the upper extremities.

584.    Kulesza did not note any radiation or neurological symptoms in the lower extremities at this evaluation.

585.    Furthermore, the initial evaluation at Paramount also noted no symptoms in the lower extremities.

586.    Despite this, Kulesza performed an EMG/NCV study of the upper **_and lower_** extremities.

587.    This EMG/NCV study found evidence of C5-C6 radiculopathy, and L4-L5 radiculopathy.

588.    The bill for this date of service included CPT codes 99244 (Neurological Initial Consultation), 95861 (EMG 2 Extremities), 95903 (NCV with F-Wave Study 4 Nerves), 95904 (NCV Sensory Study 4 Nerves), 95934 (H-Reflex 2 Muscles).

589.    This bill inappropriately charged separately for the initial consultation (using CPT code 99244) and the EDX studies (CPT codes 95903, 95904, 95861, and 95934), when the costs of evaluation are included in the costs of EDX testing.

590.    Kulesza also charged separately for each muscle and nerve tested, which amounted to inappropriate unbundling of the charges.

591.    Furthermore, the EMG study sampled only four (4) extremities, whereas the standard practice for a screening EMG is to sample a minimum of five (5) extremities to test for abnormalities.

592.    M.V. then presented for an "*__initial__*" evaluation with Hao Zhang, M.D. ("Zhang") at *__Preferred__*, on May 31, 2017.

593.    An "initial evaluation" can only be billed once per year, unless the second evaluation is done by a different physician in a different specialty.

594.    Although Zhang was purportedly a provider operating from a different facility, Preferred was merely an alternate Landow Entity continuing the same course of treatment prescribed by Paramount.

595.    Furthermore, Preferred and Paramount both "specialized" in pain management, and the evaluations conducted at these entities were, therefore, not performed by a physician in a different specialty.

596.    As such, billing both of these visits as an "initial evaluation" was fraudulent.

597.    At this subsequent "initial" evaluation, Zhang recorded complaints of neck pain and lower back pain.

598.    Zhang also noted probable diagnoses of cervical radiculopathy, and lumbar radiculopathy.

599.    Zhang prescribed M.V. continued physical therapy, and also performed an outcome assessment on M.V.

600. M.V. then presented for a follow-up evaluation with Zhang at Preferred on June 21, 2017.

601. At this follow-up, Zhang again recorded complaints neck pain and lower back pain.

602. Zhang again noted probable diagnoses of cervical radiculopathy, and lumbar radiculopathy.

603. Zhang prescribed M.V. continued physical therapy, and performed an outcome assessment on M.V.

604. Zhang recommended that M.V. present for a pain management follow-up in four (4) weeks.

605. Despite this recommendation, it does not appear that M.V. ever presented for this follow-up evaluation.

606. Despite multiple changes in treating entity, M.V. was subjected to the exact same course of treatment by the exact same providers at Paramount, Preferred, and Urban.

607. All treatment provided to M.V. was rendered at the multi-disciplinary clinic located at 90-46 Corona Avenue, Elmhurst, NY 11373.

608. M.V.'s treatment records contain no explanation as to why M.V. treated at three (3) separate entities, all purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

609. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Paramount, Preferred, and Urban, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to M.V.

610.    The documentation submitted to Allstate by the Defendants demonstrates that M.V. was subjected to excessive and medically unnecessary healthcare services from Paramount, Preferred, and Urban during the relevant period.

### ix.   Claimant J.G. (Claim No. 0479874090)

611.    Patient J.G. (Claim No. 0479874090) was purportedly involved in a motor vehicle accident on October 3, 2017.

612.    J.G. initially presented for a neurological consultation and EMG/NCV study at **_Urban_**, performed by Eric Kenworthy, M.D. ("Kenworthy").

613.    Kenworthy noted that J.G. purportedly complained of neck pain, lower back pain, and right shoulder pain, all without any noted radiation.

614.    Kenworthy also noted that J.G.'s studies were all "normal."

615.    Kenworthy prescribed J.G. ongoing physical therapy, as well as an EMG/NCV study of the upper and lower extremities.

616.    Kenworthy then performed the prescribed four-extremity EMG on J.G. on the same date of service.

617.    Altogether, Kenworthy conducted eighteen (18) motor and sensory nerve conduction studies, eight (8) F-wave tests, and two (2) H-reflex tests, totaling **_twenty-eight (28)_** nerve conduction studies ("NCS") on a single date of service.

618.    The number of NCS needed to diagnose radiculopathy in the vast majority of patients is no more than **_five (5)_** NCS.

619.    Such an extensive study is not the norm, and would typically only be performed if the patient had a particularly rare or unusual disease.

620.    However, as noted above, all of J.G.'s neurological test results were **_normal_**.

621.    Testing twenty-eight nerves in a single sitting is unreasonable, unnecessary, and is potentially dangerous and/or painful to the patient.

622.    Kenworthy's extensive study purportedly found no evidence of radiculopathy or neuropathy.

623.    Despite this, the H-reflex testing performed by Kenworthy recorded a heightened delta in the H-reflex latency, which would be considered an "abnormal" result.

624.    Kenworthy did not address this abnormality, suggesting either: (1) Kenworthy did not review the results before reaching a diagnosis, or (2) Kenworthy knew that the test was performed improperly, but failed to record this in the patient's medical records.

625.    Furthermore, Kenworthy's report noted results consistent with a diagnosis of bilateral Carpal Tunnel Syndrome in J.G.'s upper limb study.

626.    However, Kenworthy failed to provide an explanatory diagnosis of these results, or to perform additional testing to determine the cause of the abnormal findings presented in his report.

627.    Kenworthy failed to meet the standard of care for performing NCV studies, and placed the patient at risk of receiving inappropriate medical treatment.

628.    J.G. presented for an "initial" evaluation at ***Paramount*** on March 12, 2018, performed by Duque.

629.    Duque noted that J.G. complained of intermittent bilateral cervical spine pain, and intermittent bilateral lumbar spine pain, with no noted radiation.

630.    Duque also performed an outcome assessment on the same date of service, which noted that the pain was "fairly severe" at that time.

631.    Despite this, Duque discharged J.G. from further care at this appointment.

632. All treatment provided to J.G. was rendered at the multi-disciplinary clinic located at 800 St. Ann's Avenue, Bronx, New York 10456.

633. J.G.'s treatment records contain no explanation as to why J.G. treated at two (2) separate Landow Entities, both purportedly owned by the same individual and operating from the same treatment facility, during the same time period.

634. In connection with the treatment purportedly rendered to the claimant, the Defendants, through Paramount and Urban, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to J.G.

635. The documentation submitted to Allstate by the Defendants demonstrates that J.G. was subjected to excessive and medically unnecessary healthcare services from Paramount and Urban during the relevant period.

**x.   Claimant V.C. (Claim No. 0732454004)**

636. Patient V.C. (Claim No. 0732454004) was purportedly involved in a motor vehicle accident on October 14, 2023.

637. V.C. presented for an initial evaluation at ***Atlantic*** on October 20, 2023, performed by Wei Hong Xu, N.P. ("Xu").

638. Xu noted that V.C. complained of constant bilateral lumbar spine pain, and constant bilateral hip pain.

639. Interestingly, Xu also noted that V.C. had a past treatment history of "acupuncture, chiropractic and physical therapy," despite V.C. not having received any conservative care at that point.

640.    The invoice submitted for this date of service billed for CPT Codes 99204 (Initial Evaluation, 45 Minutes, Comprehensive), 20553 (Injection), Ultrasonic Guidance (76942), J0665 (Injection), J1110 (Injection), and J3490 (Unclassified Drugs).

641.    The medical report and billing records for this October 20 evaluation is contradicted by the examination under oath (EUO) testimony of V.C.

642.    V.C. testified that he had never treated with Atlantic at all, and that his treatment was rendered exclusively by Brooklyn Medical, P.C.

643.    Additionally, V.C. testified that he ***never*** received any injections at these appointments, let alone injections under ultrasonic guidance.

644.    Ultrasonic guidance is never medically indicated for a TPI, and therefore should not have been billed at all in this instance.

645.    V.C. also testified that his initial evaluation lasted, at maximum, twenty (20) minutes, and that the doctor had not taken any pain ratings, had not physically evaluated V.C., and had not taken any comprehensive medical history.

646.    Atlantic, meanwhile, submitted a bill using CPT Code 99204, which indicates both a complex evaluation involving moderate medical decision-making, and an evaluation that lasts at least 45 minutes.

647.    Despite never having a discussion with anyone at Atlantic about prescription medications, V.C. received a prescription delivery to his home.

648.    V.C. returned this delivery on the same day, as the prescribed medications would conflict with his diabetes medications—further demonstrating a lack of any comprehensive medical history on file.

649.    V.C. also presented for a physical therapy evaluation at another entity operating from the Brooklyn Medical facility on October 21, 2023.

650.    V.C. testified that the physical therapist never evaluated him, and that the physical therapist was following "the ***protocol from the front desk***[,] which is how she knew to treat him" (emphasis added).

651.    All treatment provided to V.C. was rendered at the multi-disciplinary clinic located at 5205 Church Avenue, Brooklyn, New York 11203.

652.    In connection with the treatment purportedly rendered to the claimant, the Defendants, through Atlantic, submitted documentation to Allstate, through the U.S. Mail, supporting their demand for No-Fault reimbursement in connection with the services provided to V.C.

653.    The documentation submitted to Allstate by the Defendants demonstrates that V.C. was subjected to excessive and medically unnecessary healthcare services from Atlantic during the relevant period.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

654.    Throughout the course of this scheme, Landow, Etienne, and the Management Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

655.    Unless otherwise pled to the contrary, all documents, treatment notes, testing reports, health insurance claim forms, NF-3 claim forms, narrative reports, referrals, prescriptions, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

656.    Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

   A.    **ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ("ATLANTIC") ENTERPRISE**

657.    Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Atlantic to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

658.    Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred caused Atlantic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Atlantic mailed a demand for payment (i.e., invoice) to Allstate.

659.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Macintosh's, and Preferred's direction and control provided excessive and medically unnecessary services to patients of Atlantic, which rendered Atlantic completely ineligible for No-Fault reimbursement under New York law.

660.    Because Atlantic was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Macintosh,

and Preferred purposely caused Atlantic to make a misrepresentation each and every time that Atlantic mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

661.    Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred committed mail fraud through the Atlantic enterprise because (a) Atlantic was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Atlantic was caused to seek No-Fault reimbursement from Allstate even though Atlantic was not entitled to such reimbursement, and (c) Atlantic used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

662.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred knew that Atlantic (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Atlantic.

663.    Allstate estimates that the unlawful operation of the Atlantic enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 1 and incorporated by reference as if set forth in its entirety.

### B.    BIRCH MEDICAL & DIAGNOSTIC, P.C. ("BIRCH") ENTERPRISE

664.    Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Birch to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

665.    Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign caused Birch to falsely certify that it was, in all respects,

eligible to be reimbursed under New York's No-Fault Laws each time that Birch mailed a demand for payment (i.e., invoice) to Allstate.

666.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Paramount's, Eastern's, Spruce's, Preferred's, Macintosh's, Summit's, and Sovereign's direction and control provided excessive and medically unnecessary services to patients of Birch, which rendered Birch completely ineligible for No-Fault reimbursement under New York law.

667.    Because Birch was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign purposely caused Birch to make a misrepresentation each and every time that Birch mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

668.    Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign committed mail fraud through the Birch enterprise because (a) Birch was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Birch was caused to seek No-Fault reimbursement from Allstate even though Birch was not entitled to such reimbursement, and (c) Birch used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

669.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign knew that Birch (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Birch.

670.    Allstate estimates that the unlawful operation of the Birch enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

**C.    EASTERN MEDICAL PRACTICE, P.C. ("EASTERN") ENTERPRISE**

671.    Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Eastern to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

672.    Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign caused Eastern to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Eastern mailed a demand for payment (i.e., invoice) to Allstate.

673.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Birch's, Macintosh's, Paramount's, Preferred's, Spruce's, Summit's, and Sovereign's direction and control provided excessive and medically unnecessary services to patients of Eastern, which rendered Eastern completely ineligible for No-Fault reimbursement under New York law.

674.    Because Eastern was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign purposely caused Eastern to make a misrepresentation each and every time that Eastern mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

675.    Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign committed mail fraud through the Eastern enterprise because (a) Eastern was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Eastern was caused to seek No-Fault reimbursement from Allstate even though Eastern was not entitled to such reimbursement, and (c) Eastern used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

676.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign knew that Eastern (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Eastern.

677.    Allstate estimates that the unlawful operation of the Eastern enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 3 and incorporated by reference as if set forth in its entirety.

### D.    EMPIRE MEDICAL SERVICES, P.C. ("EMPIRE") ENTERPRISE

678.    Landow, Mirzakandov, Levy, Paramount, and Preferred personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Empire to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

679.    Landow, Mirzakandov, Levy, Paramount, and Preferred caused Empire to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Empire mailed a demand for payment (i.e., invoice) to Allstate.

680.    Persons acting under Landow's, Mirzakandov's, Levy's, Paramount's, and Preferred's direction and control provided excessive and medically unnecessary services to patients of Empire, which rendered Empire completely ineligible for No-Fault reimbursement under New York law.

681.    Because Empire was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Mirzakandov, Levy, Paramount, and Preferred purposely caused Empire to make a misrepresentation each and every time that Empire mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

682.    Landow, Mirzakandov, Levy, Paramount, and Preferred committed mail fraud through the Empire enterprise because (a) Empire was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Empire was caused to seek No-Fault reimbursement from Allstate even though Empire was not entitled to such reimbursement, and (c) Empire used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

683.    At all relevant times, Landow, Mirzakandov, Levy, Paramount, and Preferred knew that Empire (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Empire.

684.    Allstate estimates that the unlawful operation of the Empire enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 4 and incorporated by reference as if set forth in its entirety.

### E.    MACINTOSH MEDICAL, P.C. ("MACINTOSH") ENTERPRISE

685.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Macintosh to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

686.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit caused Macintosh to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Macintosh mailed a demand for payment (i.e., invoice) to Allstate.

687.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Atlantic's, Birch's, Paramount's, Spruce's, and Summit's direction and control provided excessive and medically unnecessary services to patients of Macintosh, which rendered Macintosh completely ineligible for No-Fault reimbursement under New York law.

688.    Because Macintosh was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit purposely caused Macintosh to make a misrepresentation each and every time that Macintosh mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

689.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit committed mail fraud through the Macintosh enterprise because (a) Macintosh was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Macintosh was caused to seek No-Fault reimbursement from Allstate even though Macintosh was not entitled to such

reimbursement, and (c) Macintosh used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

690.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit knew that Macintosh (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Macintosh.

691.    Allstate estimates that the unlawful operation of the Macintosh enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 5 and incorporated by reference as if set forth in its entirety.

### F.    PARAMOUNT MEDICAL SERVICES, P.C. ("PARAMOUNT") ENTERPRISE

692.    Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Paramount to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

693.    Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban caused Paramount to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Paramount mailed a demand for payment (i.e., invoice) to Allstate.

694.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Birch's, Eastern's, Empire's, Macintosh's, Spruce's, and Urban's direction and control provided excessive

and medically unnecessary services to patients of Paramount, which rendered Paramount completely ineligible for No-Fault reimbursement under New York law.

695.    Because Paramount was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban purposely caused Paramount to make a misrepresentation each and every time that Paramount mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

696.    Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban committed mail fraud through the Paramount enterprise because (a) Paramount was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Paramount was caused to seek No-Fault reimbursement from Allstate even though Paramount was not entitled to such reimbursement, and (c) Paramount used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

697.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban knew that Paramount (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Paramount.

698.    Allstate estimates that the unlawful operation of the Paramount enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

G.   **PREFERRED MEDICAL, P.C. ("PREFERRED") ENTERPRISE**

699.   Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Preferred to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

700.   Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign caused Preferred to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Preferred mailed a demand for payment (i.e., invoice) to Allstate.

701.   Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Atlantic's, Birch's, Eastern's, Empire's, Spruce's, Urban's, and Sovereign's direction and control provided excessive and medically unnecessary services to patients of Preferred, which rendered Preferred completely ineligible for No-Fault reimbursement under New York law.

702.   Because Preferred was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign purposely caused Preferred to make a misrepresentation each and every time that Preferred mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

703.   Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign committed mail fraud through the Preferred enterprise because (a) Preferred was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Preferred was caused to seek No-Fault reimbursement from Allstate even though Preferred was not entitled to such

reimbursement, and (c) Preferred used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

704.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign knew that Preferred (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Preferred.

705.    Allstate estimates that the unlawful operation of the Preferred enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 7 and incorporated by reference as if set forth in its entirety.

## H.    SOVEREIGN MEDICAL SERVICES, P.C. ("SOVEREIGN") ENTERPRISE

706.    Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Sovereign to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

707.    Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred caused Sovereign to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Sovereign mailed a demand for payment (i.e., invoice) to Allstate.

708.    Persons acting under Landow's, Etienne's, Mirzakandov's, Levy's, Irsailov's, Birch's, Eastern's, Spruce's, and Preferred's direction and control provided excessive and

medically unnecessary services to patients of Sovereign, which rendered Sovereign completely ineligible for No-Fault reimbursement under New York law.

709.    Because Sovereign was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred purposely caused Sovereign to make a misrepresentation each and every time that Sovereign mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

710.    Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred committed mail fraud through the Sovereign enterprise because (a) Sovereign was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Sovereign was caused to seek No-Fault reimbursement from Allstate even though Sovereign was not entitled to such reimbursement, and (c) Sovereign used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

711.    At all relevant times, Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred knew that Sovereign (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Sovereign.

712.    Allstate estimates that the unlawful operation of the Sovereign enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 8 and incorporated by reference as if set forth in its entirety.

I.    **SPRUCE MEDICAL & DIAGNOSTIC, P.C. ("SPRUCE") ENTERPRISE**

713.    Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Spruce to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

714.    Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit caused Spruce to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Spruce mailed a demand for payment (i.e., invoice) to Allstate.

715.    Persons acting under Landow's, Mirzakandov's, Levy's, Birch's, Eastern's, Macintosh's, Paramount's, Preferred's, Sovereign's, and Summit's direction and control provided excessive and medically unnecessary services to patients of Spruce, which rendered Spruce completely ineligible for No-Fault reimbursement under New York law.

716.    Because Spruce was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit purposely caused Spruce to make a misrepresentation each and every time that Spruce mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

717.    Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, Spruce, and Summit committed mail fraud through the Spruce enterprise because (a) Spruce was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Spruce was caused to seek No-Fault reimbursement from Allstate even though Spruce was not entitled to such

reimbursement, and (c) Spruce used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

718.    At all relevant times, Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit knew that Spruce (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Spruce.

719.    Allstate estimates that the unlawful operation of the Spruce enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## J.    SUMMIT MEDICAL SERVICES, P.C. ("SUMMIT") ENTERPRISE

720.    Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Summit to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

721.    Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh caused Summit to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Summit mailed a demand for payment (i.e., invoice) to Allstate.

722.    Persons acting under Landow's, Mirzakandov's, Levy's, Birch's, Eastern's, and Macintosh's direction and control provided excessive and medically unnecessary services to patients of Summit, which rendered Summit completely ineligible for No-Fault reimbursement under New York law.

723.    Because Summit was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh purposely caused Summit to make a misrepresentation each and every time that Summit mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

724.    Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh committed mail fraud through the Summit enterprise because (a) Summit was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Summit was caused to seek No-Fault reimbursement from Allstate even though Summit was not entitled to such reimbursement, and (c) Summit used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

725.    At all relevant times, Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh knew that Summit (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Summit.

726.    Allstate estimates that the unlawful operation of the Summit enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 10 and incorporated by reference as if set forth in its entirety.

**K.    URBAN MEDICAL, P.C. ("URBAN") ENTERPRISE**

727.    Landow, Mirzakandov, Levy, Paramount, and Preferred personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing medical bills and records from Urban to be mailed to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

728.    Landow, Mirzakandov, Levy, Paramount, and Preferred caused Urban to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Urban mailed a demand for payment (i.e., invoice) to Allstate.

729.    Persons acting under Landow's, Mirzakandov's, Levy's, Paramount's, and Preferred's direction and control provided excessive and medically unnecessary services to patients of Urban, which rendered Urban completely ineligible for No-Fault reimbursement under New York law.

730.    Because Urban was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Landow, Mirzakandov, Levy, Paramount, and Preferred purposely caused Urban to make a misrepresentation each and every time that Urban mailed a document to Allstate claiming eligibility for No-Fault reimbursement.

731.    Landow, Mirzakandov, Levy, Paramount, and Preferred committed mail fraud through the Urban enterprise because (a) Urban was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Urban was caused to seek No-Fault reimbursement from Allstate even though Urban was not entitled to such reimbursement, and (c) Urban used (or was caused to use) the U.S. Mail to seek No-Fault reimbursement.

732.    At all relevant times, Landow, Mirzakandov, Levy, Paramount, and Preferred knew that Urban (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Urban.

733.    Allstate estimates that the unlawful operation of the Urban enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 11 and incorporated by reference as if set forth in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    FRAUDULENT CONCEALMENT— ATLANTIC ENTERPRISE

734.    At all relevant times during the operation of the Atlantic enterprise, Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred purposely caused Atlantic to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

735.    Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Atlantic.

736.    Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Atlantic to Allstate Claimants.

737.    Because Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Atlantic, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to

Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Atlantic, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Atlantic was caused to falsely claim eligibility each and every time that Atlantic sought No-Fault reimbursement from Allstate.

738.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred (or those persons working under their control) caused Atlantic to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

739.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

740.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

741.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

742.    Thus, every time that Landow, Etienne, Mirzakandov, Levy, Macintosh, and Preferred (along with those individuals working under their control) caused Atlantic to submit No-

Fault reimbursement demands to Allstate, Landow, Etienne, the Management Defendants, Macintosh, and Preferred (and those individuals working under their control) necessarily certified that Atlantic was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

743.    The full extent of Landow's, Etienne's, Mirzakandov's, Levy's, Macintosh's, and Preferred's fraudulent and unlawful acts relative to their participation in the Atlantic enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

**B.    FRAUDULENT CONCEALMENT— BIRCH ENTERPRISE**

744.    At all relevant times during the operation of the Birch enterprise, Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign purposely caused Birch to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

745.    Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Birch.

746.    Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Birch to Allstate Claimants.

747.    Because Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Birch, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Birch, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Birch was caused to falsely claim eligibility each and every time that Birch sought No-Fault reimbursement from Allstate.

748.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign (or those persons working under their control) caused Birch to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

749.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

750.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

751. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

752. Thus, every time that Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign (along with those individuals working under their control) caused Birch to submit No-Fault reimbursement demands to Allstate, Landow, Etienne, Mirzakandov, Levy, Paramount, Eastern, Spruce, Preferred, Macintosh, Summit, and Sovereign (and those individuals working under their control) necessarily certified that Birch was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

753. The full extent of Landow's, Mirzakandov's, Levy's, Paramount's, Eastern's, Spruce's, Preferred's, Macintosh's, Summit's, and Sovereign's fraudulent and unlawful acts relative to his participation in the Birch enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## C.   FRAUDULENT CONCEALMENT— EASTERN ENTERPRISE

754. At all relevant times during the operation of the Eastern enterprise, Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign purposely caused Eastern to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

755. Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign (along with those individuals working under their control)

purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Eastern.

756.    Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Eastern to Allstate Claimants.

757.    Because Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Eastern, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Eastern, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Eastern was caused to falsely claim eligibility each and every time that Eastern sought No-Fault reimbursement from Allstate.

758.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign (or those persons working under their control) caused Eastern to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

759.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

760.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

761.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

762.    Thus, every time that Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign (along with those individuals working under their control) caused Eastern to submit No-Fault reimbursement demands to Allstate, Landow, Etienne, Mirzakandov, Levy, Birch, Macintosh, Paramount, Preferred, Spruce, Summit, and Sovereign (and those individuals working under their control) necessarily certified that Eastern was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

763.    The full extent of Landow's, Etienne's, Mirzakandov's, Levy's, Birch's, Macintosh's, Paramount's, Preferred's, Spruce's, Summit's, and Sovereign's fraudulent and unlawful acts relative to his participation in the Eastern enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

D.    FRAUDULENT CONCEALMENT— EMPIRE ENTERPRISE

764.    At all relevant times during the operation of the Empire enterprise, Landow, Mirzakandov, Levy, Paramount, and Preferred purposely caused Empire to falsely certify that it

was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

765.    Landow, Mirzakandov, Levy, Paramount, and Preferred (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Empire.

766.    Landow, Mirzakandov, Levy, Paramount, and Preferred (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Empire to Allstate Claimants.

767.    Because Landow, Mirzakandov, Levy, Paramount, and Preferred were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Empire, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Empire, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Empire was caused to falsely claim eligibility each and every time that Empire sought No-Fault reimbursement from Allstate.

768.   As alleged above, Landow, Mirzakandov, Levy, Paramount, and Preferred (or those persons working under their control) caused Empire to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

769.   Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

770.   Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

771.   Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

772.   Thus, every time that Landow, Mirzakandov, Levy, Paramount, and Preferred (along with those individuals working under their control) caused Empire to submit No-Fault reimbursement demands to Allstate, Landow, Mirzakandov, Levy, Paramount, and Preferred (and those individuals working under their control) necessarily certified that Empire was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

773.   The full extent of Landow's, Mirzakandov's, Levy's, Paramount's, and Preferred's fraudulent and unlawful acts relative to his participation in the Empire enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### E.    FRAUDULENT CONCEALMENT— MACINTOSH ENTERPRISE

774.    At all relevant times during the operation of the Macintosh enterprise, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit purposely caused Macintosh to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

775.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Macintosh.

776.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Macintosh to Allstate Claimants.

777.    Because Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Macintosh, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Macintosh, (d) falsely charging for the treatments, tests, and services with the

knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Macintosh was caused to falsely claim eligibility each and every time that Macintosh sought No-Fault reimbursement from Allstate.

778.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit (or those persons working under their control) caused Macintosh to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

779.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

780.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

781.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

782.    Thus, every time that Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit (along with those individuals working under their control) caused Macintosh to submit No-Fault reimbursement demands to Allstate, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Paramount, Spruce, and Summit (and those individuals

working under their control) necessarily certified that Macintosh was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

783.    The full extent of Landow's, Etienne's, Mirzakandov's, Levy's, Atlantic's, Birch's, Paramount's, Spruce's, and Summit's fraudulent and unlawful acts relative to his participation in the Macintosh enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### F.    FRAUDULENT CONCEALMENT— PARAMOUNT ENTERPRISE

784.    At all relevant times during the operation of the Paramount enterprise, Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban purposely caused Paramount to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

785.    Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Paramount.

786.    Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Paramount to Allstate Claimants.

787.    Because Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Paramount, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Paramount, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Paramount was caused to falsely claim eligibility each and every time that Paramount sought No-Fault reimbursement from Allstate.

788.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban (or those persons working under their control) caused Paramount to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

789.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

790.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

791.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

792.    Thus, every time that Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban (along with those individuals working under their control) caused Paramount to submit No-Fault reimbursement demands to Allstate, Landow, Etienne, Mirzakandov, Levy, Birch, Eastern, Empire, Macintosh, Spruce, and Urban (and those individuals working under their control) necessarily certified that Paramount was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

793.    The full extent of Landow's, Etienne's, Mirzakandov's, Levy's, Birch's, Eastern's, Empire's, Macintosh's, Spruce's, and Urban's fraudulent and unlawful acts relative to his participation in the Paramount enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### G.    FRAUDULENT CONCEALMENT— PREFERRED ENTERPRISE

794.    At all relevant times during the operation of the Preferred enterprise, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign purposely caused Preferred to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

795.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign (along with those individuals working under their control) purposely

concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Preferred.

796.    Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Preferred to Allstate Claimants.

797.    Because Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Preferred, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Preferred, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Preferred was caused to falsely claim eligibility each and every time that Preferred sought No-Fault reimbursement from Allstate.

798.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign (or those persons working under their control) caused Preferred to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

799. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

800. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

801. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

802. Thus, every time that Landow, Etienne, Mirzakandov, Levy, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign (along with those individuals working under their control) caused Preferred to submit No-Fault reimbursement demands to Allstate, Landow, Etienne the Management Defendants, Atlantic, Birch, Eastern, Empire, Spruce, Urban, and Sovereign (and those individuals working under their control) necessarily certified that Preferred was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

803. The full extent of Landow's, Etienne's, Mirzakandov's, Levy's, Atlantic's, Birch's, Eastern's, Empire's, Spruce's, Urban's, and Sovereign's fraudulent and unlawful acts relative to his participation in the Preferred enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## H.    FRAUDULENT CONCEALMENT— SOVEREIGN ENTERPRISE

804. At all relevant times during the operation of the Sovereign enterprise, Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred purposely caused

Sovereign to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

805.    Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, Preferred (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Sovereign.

806.    Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Sovereign to Allstate Claimants.

807.    Because Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Sovereign, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Sovereign, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in

114

certain instances, never actually provided, Sovereign was caused to falsely claim eligibility each and every time that Sovereign sought No-Fault reimbursement from Allstate.

808.    As alleged above, Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred (or those persons working under their control) caused Sovereign to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

809.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

810.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

811.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

812.    Thus, every time that Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred (along with those individuals working under their control) caused Sovereign to submit No-Fault reimbursement demands to Allstate, Landow, Etienne, Mirzakandov, Levy, Israilov, Birch, Eastern, Spruce, and Preferred (and those individuals working under their control) necessarily certified that Sovereign was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

813.    The full extent of Landow's, Mirzakandov's, Levy's, Israilov's, Birch's, Eastern's, Spruce's, and Preferred's fraudulent and unlawful acts relative to his participation in the Sovereign enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

I.    **FRAUDULENT CONCEALMENT— SPRUCE ENTERPRISE**

814.    At all relevant times during the operation of the Spruce enterprise, Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit purposely caused Spruce to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

815.    Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Spruce.

816.    Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Spruce to Allstate Claimants.

817.    Because Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through

116

Spruce, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Spruce, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Spruce was caused to falsely claim eligibility each and every time that Spruce sought No-Fault reimbursement from Allstate.

818. As alleged above, Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit (or those persons working under his control) caused Spruce to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

819. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

820. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

821. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

822.    Thus, every time that Landow, Mirzakandov, Levy, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit (along with those individuals working under their control) caused Spruce to submit No-Fault reimbursement demands to Allstate, Landow, the Management Defendants, Birch, Eastern, Macintosh, Paramount, Preferred, Sovereign, and Summit (and those individuals working under their control) necessarily certified that Spruce was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

823.    The full extent of Landow's, Mirzakandov's, Levy's, Birch's, Eastern's, Macintosh's, Paramount's, Preferred's, Sovereign's, and Summit's fraudulent and unlawful acts relative to his participation in the Spruce enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### J.    FRAUDULENT CONCEALMENT— SUMMIT ENTERPRISE

824.    At all relevant times during the operation of the Summit enterprise, Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh purposely caused Summit to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

825.    Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Summit.

826.    Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain

management treatments and services, and diagnostic testing services, purportedly provided by Summit to Allstate Claimants.

827.    Because Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Summit, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Summit, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Summit was caused to falsely claim eligibility each and every time that Summit sought No-Fault reimbursement from Allstate.

828.    As alleged above, Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh (or those persons working under their control) caused Summit to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

829.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

830.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which

Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

831.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

832.    Thus, every time that Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh (along with those individuals working under their control) caused Summit to submit No-Fault reimbursement demands to Allstate, Landow, Mirzakandov, Levy, Birch, Eastern, and Macintosh (and those individuals working under their control) necessarily certified that Summit was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

833.    The full extent of Landow's, Mirzakandov's, Levy's, Birch's, Eastern's, and Macintosh's fraudulent and unlawful acts relative to his participation in the Summit enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### K.    FRAUDULENT CONCEALMENT— URBAN ENTERPRISE

834.    At all relevant times during the operation of the Urban enterprise, Landow, Mirzakandov, Levy, Paramount, and Preferred purposely caused Urban to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary pain management treatment and services purportedly provided to Allstate Claimants.

835.    Landow, Mirzakandov, Levy, Paramount, and Preferred (along with those individuals working under their control) purposely concealed the lack of medical necessity for the pain management treatments and services purportedly provided and charged for by Urban.

836.    Landow, Mirzakandov, Levy, Paramount, and Preferred (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the pain management treatments and services, and diagnostic testing services, purportedly provided by Urban to Allstate Claimants.

837.    Because Landow, Mirzakandov, Levy, Paramount, and Preferred were responsible for (a) directing the excessive and medically unnecessary treatments, tests, and services purportedly rendered to Allstate Claimants through Urban, (b) creating, altering, and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary pain management treatments, tests, and services purportedly rendered to Allstate Claimants through Urban, (d) falsely charging for the treatments, tests, and services with the knowledge that these treatments, tests, and services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for treatments, tests, and services that were, in certain instances, never actually provided, Urban was caused to falsely claim eligibility each and every time that Urban sought No-Fault reimbursement from Allstate.

838.    As alleged above, Landow, Mirzakandov, Levy, Paramount, and Preferred (or those persons working under their control) caused Urban to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to treatments, tests, and services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not actually provided.

839.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

840.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for treatments, tests, and services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

841.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

842.    Thus, every time that Landow, Mirzakandov, Levy, Paramount, and Preferred (along with those individuals working under their control) caused Urban to submit No-Fault reimbursement demands to Allstate, Landow, Mirzakandov, Levy, Paramount, and Preferred (and those individuals working under their control) necessarily certified that Urban was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

843.    The full extent of Landow's, Mirzakandov's, Levy's, Paramount's, and Preferred's fraudulent and unlawful acts relative to his participation in the Urban enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.  **ALLSTATE'S JUSTIFIABLE RELIANCE**

844.    Each claim submitted to Allstate by (or on behalf of) the PC Defendants was verified pursuant to Insurance Law § 403.

845.    At all relevant times, Landow and Etienne, as licensed a healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

846.    To induce Allstate to promptly pay the PC Defendants' invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that the PC Defendants were eligible to be reimbursed under New York's No-Fault laws.

847.    Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services purportedly provided to patients of the PC Defendants, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate.  These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that the PC Defendants' invoices are not promptly paid in full.

848.    Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

849.    At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding the PC Defendants' reimbursement eligibility under New York law.

850.    Acting in reasonable reliance on these misrepresentations, Allstate paid money to the PC Defendants to its detriment.

851.    Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about the PC Defendants' reimbursement eligibility under New York law, including the operation of these entities and the fact and necessity of the services provided.

852.    As a result of the defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the defendants' false healthcare documentation and false

representations regarding the defendants' eligibility for reimbursement under New York's No-Fault laws.

853.   Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX.   **DAMAGES**

854.   The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to the PC Defendants in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a) Payments made to Atlantic Medical & Diagnostic, P.C. totaling at least $687,915.88, the exact amount to be determined at trial. The chart at Exhibit 12 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Atlantic Medical & Diagnostic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b) Payments made to Birch Medical & Diagnostic, P.C. totaling at least $55,104.14, the exact amount to be determined at trial. The chart at Exhibit 13 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Birch Medical & Diagnostic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(c) Payments made to Eastern Medical Practice, P.C. totaling at least $131,965.80, the exact amount to be determined at trial. The chart at Exhibit 14 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Eastern Medical Practice, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(d) Payments made to Empire Medical Services, P.C. totaling at least $91,829.48, the exact amount to be determined at trial. The chart at Exhibit 15 and incorporated herein as if

set forth in its entirety, identifies Allstate's payments to Empire Medical Services, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(e) Payments made to Macintosh Medical, P.C. totaling at least $1,455,206.18, the exact amount to be determined at trial. The chart at Exhibit 16 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Macintosh Medical, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(f) Payments made to Paramount Medical Services, P.C. totaling at least $283,017.63, the exact amount to be determined at trial. The chart at Exhibit 17 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Paramount Medical Services, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(g) Payments made to Preferred Medical, P.C. totaling at least $220,430.98, the exact amount to be determined at trial. The chart at Exhibit 18 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Preferred Medical, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(h) Payments made to Sovereign Medical Services, P.C. totaling at least $149,620.48, the exact amount to be determined at trial. The chart at Exhibit 19 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Sovereign Medical Services, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(i) Payments made to Spruce Medical & Diagnostic, P.C. totaling at least $250,796.31, the exact amount to be determined at trial. The chart at Exhibit 20 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Spruce Medical & Diagnostic, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(j) Payments made to Summit Medical Services, P.C. totaling at least $126,176.54, the exact amount to be determined at trial. The chart at Exhibit 21 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Summit Medical Services, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(k) Payments made to Urban Medical, P.C. totaling at least $104,455.05, the exact amount to be determined at trial. The chart at Exhibit 22 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Urban Medical, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE
### (Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C.)

855.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

856.    Atlantic Medical & Diagnostic, P.C. ("Atlantic") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

857.    In connection with the operation and management of the Atlantic enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C. (collectively, Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Atlantic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Atlantic would occur, in furtherance of their scheme to defraud.

858.    The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 1.

859.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

860.    Policies of insurance were also delivered to insureds through the U.S. Mail.

861.    Payments made by Allstate to Atlantic traveled through the U.S. Mail.

862.    As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Atlantic—payments that the Count I Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

863.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Atlantic for the benefit of the Count I Defendants that would not otherwise have been made.

864.    The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

865.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

866.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

867.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Atlantic for the benefit of the Count I Defendants.

868.    The Count I Defendants participated in the conduct of the Atlantic enterprise through a pattern of racketeering activities.

869.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

870.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

871.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

872.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

873.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C.)**

874.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

875.    Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C. (collectively, the Count II Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Atlantic Medical & Diagnostic, P.C. ("Atlantic").

876. The Count II Defendants agreed to further, facilitate, support, and operate the Atlantic enterprise.

877. As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

878. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Atlantic even though Atlantic was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

879. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Atlantic, the provision of false, fraudulent, and unnecessary healthcare services to Atlantic patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Atlantic's No-Fault reimbursement eligibility.

880. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Atlantic as a result of the Count II Defendants' unlawful conduct described herein.

881. By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BIRCH MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

882.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

883.    Birch Medical & Diagnostic, P.C. ("Birch") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

884.    In connection with the operation and management of the Birch enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Birch's business, or should have reasonably foreseen that the mailing of such false medical documentation by Birch would occur, in furtherance of their scheme to defraud.

885.    The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 2.

130

886.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

887.    Policies of insurance were also delivered to insureds through the U.S. Mail.

888.    Payments made by Allstate to Birch traveled through the U.S. Mail.

889.    As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Birch—payments that Landow intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

890.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Birch for the benefit of Landow that would not otherwise have been made.

891.    The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling Landow to continue this unlawful scheme without being detected.

892.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

893.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

894.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Birch for the benefit of the Count III Defendants.

895.    The Count III Defendants participated in the conduct of the Birch enterprise through a pattern of racketeering activities.

896.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

897.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

898.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

899.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

900.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT IV</u>
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BIRCH MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

901.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

902.    Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count IV Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Birch Medical & Diagnostic, P.C. ("Birch").

903.    The Count IV Defendants agreed to further, facilitate, support, and operate the Birch enterprise.

904.    As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

905.    The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Birch even though Birch was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

906.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Birch, the provision of false, fraudulent, and unnecessary healthcare services to Birch patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Birch's No-Fault reimbursement eligibility.

907.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Birch as a result of the Count IV Defendants' unlawful conduct described herein.

908.   By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EASTERN MEDICAL PRACTICE, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

909.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

910.   Eastern Medical Practice, P.C. ("Eastern") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

911.   In connection with the operation and management of the Eastern enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Eastern's business, or should have reasonably foreseen that the mailing of such false medical documentation by Eastern would occur, in furtherance of their scheme to defraud.

912.    The Count V Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 3.

913.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

914.    Policies of insurance were also delivered to insureds through the U.S. Mail.

915.    Payments made by Allstate to Eastern traveled through the U.S. Mail.

916.    As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Eastern— payments that the Count V Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

917.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Eastern for the benefit of the Count V Defendants that would not otherwise have been made.

918.    The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

919.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

920.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

921.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Eastern for the benefit of the Count V Defendants.

922.    The Count V Defendants participated in the conduct of the Eastern enterprise through a pattern of racketeering activities.

923.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

924.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

925.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

926.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

927.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## EASTERN MEDICAL PRACTICE, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

928.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

929.    Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count VI Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Eastern Medical Practice, P.C. ("Eastern").

930.    The Count VI Defendants agreed to further, facilitate, support, and operate the Eastern enterprise.

931.    As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

932.    The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Eastern even though Eastern was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

933.    The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Eastern, the provision of false, fraudulent, and unnecessary healthcare services to Eastern patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other

claim-related documents that materially misrepresented Eastern's No-Fault reimbursement eligibility.

934.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Eastern as a result of the Count VI Defendants' unlawful conduct described herein.

935.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EMPIRE MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

936.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

937.    Empire Medical Services, P.C. ("Empire") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

938.    In connection with the operation and management of the Empire enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C. (collectively, the "Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Empire's business, or should

have reasonably foreseen that the mailing of such false medical documentation by Empire would occur, in furtherance of their scheme to defraud.

939.    The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 4.

940.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

941.    Policies of insurance were also delivered to insureds through the U.S. Mail.

942.    Payments made by Allstate to Empire traveled through the U.S. Mail.

943.    As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Empire— payments that the Count VII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

944.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Empire for the benefit of the Count VII Defendants that would not otherwise have been made.

945.    The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue this unlawful scheme without being detected.

946.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

947.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

948.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Empire for the benefit of the Count VII Defendants.

949.    The Count VII Defendants participated in the conduct of the Empire enterprise through a pattern of racketeering activities.

950.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

951.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

952.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

953.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

954.    By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### EMPIRE MEDICAL SERVICES, P.C. ENTERPRISE
### (Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)

955.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

956.     Defendants Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C. (collectively, the "Count VIII Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Empire Medical Services, P.C. ("Empire").

957.     The Count VIII Defendants agreed to further, facilitate, support, and operate the Empire enterprise.

958.     As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

959.     The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Empire even though Empire was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

960.     The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Empire, the provision of false, fraudulent, and unnecessary healthcare services to Empire patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Empire's No-Fault reimbursement eligibility.

961.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Empire as a result of the Count VIII Defendants' unlawful conduct described herein.

962.    By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT IX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## MACINTOSH MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C.)**

963.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

964.    Macintosh Medical, P.C. ("Macintosh") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

965.    In connection with the operation and management of the Macintosh enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C. (collectively, the "Count IX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary

course of Macintosh's business, or should have reasonably foreseen that the mailing of such false medical documentation by Macintosh would occur, in furtherance of their scheme to defraud.

966.    The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 5.

967.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

968.    Policies of insurance were also delivered to insureds through the U.S. Mail.

969.    Payments made by Allstate to Macintosh traveled through the U.S. Mail.

970.    As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Macintosh—payments that the Count IX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

971.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Macintosh for the benefit of the Count IX Defendants that would not otherwise have been made.

972.    The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue this unlawful scheme without being detected.

973.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

974.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

975.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Macintosh for the benefit of the Count IX Defendants.

976.    The Count IX Defendants participated in the conduct of the Macintosh enterprise through a pattern of racketeering activities.

977.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

978.    The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

979.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

980.    Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

981.    By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### MACINTOSH MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C.)**

982.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

983.    Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C. (collectively, the "Count X Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Macintosh Medical, P.C. ("Macintosh").

984.    The Count X Defendants agreed to further, facilitate, support, and operate the Macintosh enterprise.

985.    As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

986.    The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Macintosh even though Macintosh was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

987.    The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Macintosh, the provision of false, fraudulent, and unnecessary healthcare services to Macintosh patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other

claim-related documents that materially misrepresented Macintosh's No-Fault reimbursement eligibility.

988.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Macintosh as a result of the Count X Defendants' unlawful conduct described herein.

989.    By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PARAMOUNT MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C.)**

990.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

991.    Paramount Medical Services, P.C. ("Paramount") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

992.    In connection with the operation and management of the Paramount enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C., (collectively, the "Count XI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with

Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Paramount's business, or should have reasonably foreseen that the mailing of such false medical documentation by Paramount would occur, in furtherance of their scheme to defraud.

993.    The Count XI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 6.

994.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

995.    Policies of insurance were also delivered to insureds through the U.S. Mail.

996.    Payments made by Allstate to Paramount traveled through the U.S. Mail.

997.    As documented above, the Count XI Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Paramount—payments that the Count XI Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

998.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Paramount for the benefit of the Count XI Defendants that would not otherwise have been made.

999.    The Count XI Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count XI Defendants to continue this unlawful scheme without being detected.

1000.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1001.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1002.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Paramount for the benefit of the Count XI Defendants.

1003.   The Count XI Defendants participated in the conduct of the Paramount enterprise through a pattern of racketeering activities.

1004.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1005.   The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1006.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1007.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1008.   By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PARAMOUNT MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C.)**

1009.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1010.   Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C. (collectively, the "Count XII Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Paramount Medical Services, P.C. ("Paramount").

1011.   The Count XII Defendants agreed to further, facilitate, support, and operate the Paramount enterprise.

1012.   As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1013.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Paramount even though Paramount was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XII Defendants.

1014.   The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Paramount, the

provision of false, fraudulent, and unnecessary healthcare services to Paramount patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Paramount's No-Fault reimbursement eligibility.

1015.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Paramount as a result of the Count XII Defendants' unlawful conduct described herein.

1016.    By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PREFERRED MEDICAL, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C.)**

1017.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1018.    Preferred Medical, P.C. ("Preferred") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1019.    In connection with the operation and management of the Preferred enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C.,

Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count XIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Preferred's business, or should have reasonably foreseen that the mailing of such false medical documentation by Preferred would occur, in furtherance of their scheme to defraud.

1020.    The Count XIII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 7.

1021.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1022.    Policies of insurance were also delivered to insureds through the U.S. Mail.

1023.    Payments made by Allstate to Preferred traveled through the U.S. Mail.

1024.    As documented above, the Count XIII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Preferred— payments that the Count XIII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1025.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Preferred for the benefit of the Count XIII Defendants that would not otherwise have been made.

1026.   The Count XIII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII Defendants to continue this unlawful scheme without being detected.

1027.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1028.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1029.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Preferred for the benefit of the Count XIII Defendants.

1030.   The Count XIII Defendants participated in the conduct of the Preferred enterprise through a pattern of racketeering activities.

1031.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII Defendants' conduct.

1032.   The Count XIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1033.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1034.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1035.    By virtue of the Count XIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## PREFERRED MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C.)**

1036.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1037.    Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C. (collectively, the "Count XIV Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Preferred Medical, P.C. ("Preferred").

1038.    The Count XIV Defendants agreed to further, facilitate, support, and operate the Preferred enterprise.

1039.    As such, the Count XIV Defendants conspired to violate 18 U.S.C. § 1962(c).

1040.    The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Preferred even though Preferred was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XIV Defendants.

1041.   The Count XIV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Preferred, the provision of false, fraudulent, and unnecessary healthcare services to Preferred patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Preferred's No-Fault reimbursement eligibility.

1042.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Preferred as a result of the Count XIV Defendants' unlawful conduct described herein.

1043.   By virtue of the Count XIV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XV
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SOVEREIGN MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C.)**

1044.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1045.   Sovereign Medical Services, P.C. ("Sovereign") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1046.   In connection with the operation and management of the Sovereign enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic,

P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C. (collectively, the "Count XV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Sovereign's business, or should have reasonably foreseen that the mailing of such false medical documentation by Sovereign would occur, in furtherance of their scheme to defraud.

1047.  The Count XV Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 8.

1048.  Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1049.  Policies of insurance were also delivered to insureds through the U.S. Mail.

1050.  Payments made by Allstate to Sovereign traveled through the U.S. Mail.

1051.  As documented above, the Count XV Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Sovereign—payments that the Count XV Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1052.  As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Sovereign for the benefit of Landow that would not otherwise have been made.

1053.   The Count XV Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV Defendants to continue this unlawful scheme without being detected.

1054.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1055.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1056.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Sovereign for the benefit of the Count XV Defendants.

1057.   The Count XV Defendants participated in the conduct of the Sovereign enterprise through a pattern of racketeering activities.

1058.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV Defendants' conduct.

1059.   The Count XV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1060.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1061.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1062.   By virtue of the Count XV Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XVI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SOVEREIGN MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C.)**

1063.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1064.   Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C. (collectively, the "Count XVI Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Sovereign Medical Services, P.C. ("Sovereign").

1065.   The Count XVI Defendants agreed to further, facilitate, support, and operate the Sovereign enterprise.

1066.   As such, the Count XVI Defendants conspired to violate 18 U.S.C. § 1962(c).

1067.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Sovereign even though Sovereign was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XVI Defendants.

1068.   The Count XVI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Sovereign, the

provision of false, fraudulent, and unnecessary healthcare services to Sovereign patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Sovereign's No-Fault reimbursement eligibility.

1069.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Sovereign as a result of the Count XVI Defendants' unlawful conduct described herein.

1070.   By virtue of the Count XVI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT XVII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SPRUCE MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., and Summit Medical Services, P.C.)**

1071.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1072.   Spruce Medical & Diagnostic, P.C. ("Spruce") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1073.   In connection with the operation and management of the Spruce enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign

Medical Services, P.C., and Summit Medical Services, P.C. (collectively, the "Count XVII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Spruce's business, or should have reasonably foreseen that the mailing of such false medical documentation by Spruce would occur, in furtherance of their scheme to defraud.

1074. The Count XVII Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 9.

1075. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1076. Policies of insurance were also delivered to insureds through the U.S. Mail.

1077. Payments made by Allstate to Spruce traveled through the U.S. Mail.

1078. As documented above, the Count XVII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Spruce—payments that Landow intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1079. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Spruce for the benefit of the Count XVII Defendants that would not otherwise have been made.

1080.   The Count XVII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XVII Defendants to continue this unlawful scheme without being detected.

1081.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1082.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XVII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1083.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Spruce for the benefit of the Count XVII Defendants.

1084.   The Count XVII Defendants participated in the conduct of the Spruce enterprise through a pattern of racketeering activities.

1085.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XVII Defendants' conduct.

1086.   The Count XVII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1087.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1088.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1089.   By virtue of the Count XVII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SPRUCE MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., and Summit Medical Services, P.C.)**

1090.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1091.   Defendants Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., and Summit Medical Services, P.C. (collectively, the "Count XVIII Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Spruce Medical & Diagnostic, P.C. ("Spruce").

1092.   The Count XVIII Defendants agreed to further, facilitate, support, and operate the Spruce enterprise.

1093.   As such, the Count XVIII Defendants conspired to violate 18 U.S.C. § 1962(c).

1094.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Spruce even though Spruce was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XVIII Defendants .

1095.   The Count XVIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Spruce, the provision of false, fraudulent, and unnecessary healthcare services to Spruce patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Spruce's No-Fault reimbursement eligibility.

1096.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Spruce as a result of the Count XVIII Defendants' unlawful conduct described herein.

1097.   By virtue of the Count XVIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

### COUNT XIX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SUMMIT MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and Macintosh Medical, P.C.)**

1098.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1099.   Summit Medical Services, P.C. ("Summit") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1100.   In connection with the operation and management of the Summit enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and

Macintosh Medical, P.C. (collectively, the "Count XIX Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Summit's business, or should have reasonably foreseen that the mailing of such false medical documentation by Summit would occur, in furtherance of their scheme to defraud.

1101.    The Count XIX Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 10.

1102.    Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1103.    Policies of insurance were also delivered to insureds through the U.S. Mail.

1104.    Payments made by Allstate to Summit traveled through the U.S. Mail.

1105.    As documented above, the Count XIX Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Summit—payments that the Count XIX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1106.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Summit for the benefit of the Count XIX Defendants that would not otherwise have been made.

1107.   Landow's pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling Landow to continue this unlawful scheme without being detected.

1108.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1109.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XIX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1110.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit for the benefit of the Count XIX Defendants.

1111.   The Count XIX Defendants participated in the conduct of the Summit enterprise through a pattern of racketeering activities.

1112.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIX Defendants' conduct.

1113.   The Count XIX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1114.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1115.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1116.   By virtue of the Count XIX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XX
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SUMMIT MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and Macintosh Medical, P.C.)**

1117.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1118.   Defendants Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and Macintosh Medical, P.C. (collectively, the "Count XX Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Summit Medical Services, P.C. ("Summit").

1119.   The Count XX Defendants agreed to further, facilitate, support, and operate the Summit enterprise.

1120.   As such, the Count XX Defendants conspired to violate 18 U.S.C. § 1962(c).

1121.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Summit even though Summit was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XX Defendants.

1122.   The Count XX Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Summit, the provision of false, fraudulent, and unnecessary healthcare services to Summit patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other

claim-related documents that materially misrepresented Summit's No-Fault reimbursement eligibility.

1123.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Summit as a result of the Count XX Defendants' unlawful conduct described herein.

1124.   By virtue of the Count XX Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

**COUNT XXI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**URBAN MEDICAL, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

1125.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1126.   Urban Medical, P.C. ("Urban") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1127.   In connection with the operation and management of the Urban enterprise and with each of the claims identified in the plaintiffs' Complaint, Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C. (collectively, the "Count XXI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Urban's business, or should

have reasonably foreseen that the mailing of such false medical documentation by Urban would occur, in furtherance of their scheme to defraud.

1128.  The Count XXI Defendants employed, knew, or should have foreseen two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 11.

1129.  Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

1130.  Policies of insurance were also delivered to insureds through the U.S. Mail.

1131.  Payments made by Allstate to Urban traveled through the U.S. Mail.

1132.  As documented above, the Count XXI Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Urban—payments that Landow intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1133.  As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Urban for the benefit of the Count XXI Defendants that would not otherwise have been made.

1134.  The Count XXI Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling Landow to continue this unlawful scheme without being detected.

1135.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

1136.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XXI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1137.   The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Urban for the benefit of the Count XXI Defendants.

1138.   The Count XXI Defendants participated in the conduct of the Urban enterprise through a pattern of racketeering activities.

1139.   Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XXI Defendants' conduct.

1140.   The Count XXI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1141.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1142.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

By virtue of the Count XXI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by him, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXII
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## URBAN MEDICAL, P.C. ENTERPRISE
### (Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)

1143.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1144.   Defendants Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C. (collectively, the "Count XXII Defendants") willfully conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Urban Medical, P.C. ("Urban").

1145.   The Count XXII Defendants agreed to further, facilitate, support, and operate the Urban enterprise.

1146.   As such, the Count XXII Defendants conspired to violate 18 U.S.C. § 1962(c).

1147.   The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Urban even though Urban was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XXII Defendants.

1148.   The Count XXII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Urban, the provision of false, fraudulent, and unnecessary healthcare services to Urban patients, and the creation and submission to Allstate of No-Fault claim forms (i.e., NF-3s), bills, invoices, and other claim-related documents that materially misrepresented Urban's No-Fault reimbursement eligibility.

1149.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Urban as a result of the Count XXII Defendants' unlawful conduct described herein.

1150.   By virtue of the Count XXII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

### COUNT XXIII
### COMMON LAW FRAUD
### (Against All Defendants)

1151.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1152.   Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Roman Israilov, Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Urban Medical, P.C. (collectively, "Count XXIII Defendants"), conspired to defraud Allstate through their unlawful management and control of Atlantic, Birch, Eastern, Empire, Macintosh, Paramount, Preferred, Sovereign, Spruce, Summit, and Urban (collectively, the "PC Defendants").

1153.   The Count XXIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the PC Defendants were entitled to receive No-Fault reimbursement under New York law.

1154.   The misrepresentations of fact by the Count XXIII Defendants included, but were not limited to, the material misrepresentations of fact made in the PC Defendants' NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients and the actual ownership and control of the PC Defendants.

1155.   The Count XXIII Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1156.   The misrepresentations were intentionally made by the Count XXIII Defendants in furtherance of their scheme to defraud Allstate by submitting claims from the PC Defendants—unlawfully operated and controlled professional service corporations—for payment of No-Fault insurance benefits.

1157.   The Count XXIII Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1158.   Allstate reasonably relied, to its detriment, upon the Count XXIII Defendants' material misrepresentations concerning the PC Defendants' eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through the PC Defendants.

1159.   Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to the PC Defendants—in excess of $3,556,518.47—for healthcare services purportedly provided to patients through the PC Defendants, even though the PC Defendants were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

1160.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1161.   As alleged herein, Defendants Jonathan S. Landow, M.D., Viviane Etienne, M.D., Roman Israilov, Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Urban Medical, P.C. (collectively, "Count XXIV Defendants") conspired to induce Allstate to make numerous substantial payments to the PC Defendants pursuant to New York's No-Fault Laws.

1162.   When Allstate made No-Fault payments to the PC Defendants, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XXIV Defendants, or those persons working under their control, made concerning the PC Defendants' reimbursement eligibility under New York's No-Fault Laws.

1163.   Each and every No-Fault benefit payment that Allstate was caused to make to the PC Defendants during the course of this scheme constitutes a benefit that the Count XXIV Defendants aggressively caused the PC Defendants to seek and voluntarily accept.

1164.   Throughout the course of their scheme, the Count XXIV Defendants caused the PC Defendants to wrongfully obtain from Allstate No-Fault benefit payments totaling over $3,556,518.47 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1165.   Throughout the duration of this scheme, the Count XXIV Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to PC Defendants.

1166.   Retention of those benefits by the Count XXIV Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXV
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against the PC Defendants)

1167.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-854 as if set forth fully herein.

1168.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1169.   In view of their (a) illegal corporate structure, (b) unlawful control by one or more non-physician, (c) unlawful sharing of professional physician fees with one or more non-physician, (d) billing for healthcare services that were not actually rendered, (e) billing for services rendered pursuant to an unlawful referral, and (f) billing for excessive and medically unnecessary healthcare services, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Urban Medical, P.C. (collectively, the "PC Defendants") have, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services

(including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus have no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to the PC Defendants by their patients.

1170.   The PC Defendants continue to challenge Allstate's prior claim denials.

1171.   The PC Defendants continue to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1172.   A justifiable controversy exists between Allstate and the PC Defendants because the PC Defendants reject Allstate's ability to deny such claims.

1173.   Allstate has no adequate remedy at law.

1174.   The PC Defendants will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by the PC Defendants.

1175.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants, at all relevant times, were (a) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (b) billing for healthcare services that were not actually rendered, (c) billing for services rendered pursuant to an unlawful referral, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus have no standing to submit or receive assigned No-Fault benefits.

## XI.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity

Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ATLANTIC MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Macintosh Medical, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BIRCH MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**BIRCH MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., Preferred Medical, P.C., Macintosh Medical, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## EASTERN MEDICAL PRACTICE, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## EASTERN MEDICAL PRACTICE, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Sovereign Medical Services, P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### EMPIRE MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### EMPIRE MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### MACINTOSH MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### MACINTOSH MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Paramount Medical Services, P.C., Spruce Medical & Diagnostic, P.C., and Summit Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PARAMOUNT MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XII
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PARAMOUNT MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Spruce Medical & Diagnostic, P.C., and Urban Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIII
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PREFERRED MEDICAL, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Vivienne Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## PREFERRED MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Vivienne Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Urban Medical, P.C., and Sovereign Medical Services, P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT XV
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## SOVEREIGN MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C.)**

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SOVEREIGN MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Viviane Etienne, M.D., Uriyel Mirzakandov, Ruben Levy, Roman Israilov, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Spruce Medical & Diagnostic, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SPRUCE MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., and Summit Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and

attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XVIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SPRUCE MEDICAL & DIAGNOSTIC, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C. Sovereign Medical Services, P.C., and Summit Medical Services, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XIX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SUMMIT MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and Macintosh Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XX
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SUMMIT MEDICAL SERVICES, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., and Macintosh Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XXI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### URBAN MEDICAL P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XXII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### URBAN MEDICAL, P.C. ENTERPRISE
**(Against Jonathan S. Landow, M.D., Uriyel Mirzakandov, Ruben Levy, Paramount Medical Services, P.C., and Preferred Medical, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIII
## COMMON LAW FRAUD
### (Against All Defendants)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

## COUNT XXIV
## UNJUST ENRICHMENT
### (Against All Defendants)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

## COUNT XXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against the PC Defendants)

(a) DECLARE that Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Urban

Medical, P.C., at all relevant times, have been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Atlantic Medical & Diagnostic, P.C.'s, Birch Medical & Diagnostic, P.C.'s, Eastern Medical Practice, P.C.'s, Empire Medical Services, P.C.'s, Macintosh Medical, P.C.'s, Paramount Medical Services, P.C.'s, Preferred Medical, P.C.'s, Sovereign Medical Services, P.C.'s, Spruce Medical & Diagnostic, P.C.'s, Summit Medical Services, P.C.'s, and Urban Medical, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., and Urban Medical, P.C.; and

(d) GRANT all other relief this Court deems just.

## XII.    **JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, McETTRICK, & BRINK, P.C.

*/s/ Shauna L. Sullivan*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C. M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (office)


Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company*


Dated: March 19, 2024