UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ALLSTATE INSURANCE COMPANY,                          :
ALLSTATE INDEMNITY COMPANY,                          :
ALLSTATE PROPERTY & CASUALTY                         :
INSURANCE COMPANY, and                               :
ALLSTATE FIRE & CASUALTY INSURANCE                   :
COMPANY,                                             :
                                                     :
                              Plaintiffs,            :
                                                     :
                    -against-                        :     **MEMORANDUM AND ORDER**
                                                     :     24-cv-2010 (DLI) (JRC)
JONATHAN S. LANDOW, M.D., VIVIANE                    :
ETIENNE, M.D., ATLANTIC MEDICAL &                    :
DIAGNOSTIC, P.C., BIRCH MEDICAL &                    :
DIAGNOSTIC, P.C., EASTERN MEDICAL                    :
PRACTICE, P.C., EMPIRE MEDICAL                       :
SERVICES, P.C., MACINTOSH MEDICAL, P.C.,             :
PARAMOUNT MEDICAL SERVICES, P.C.,                    :
PREFERRED MEDICAL, P.C., SOVEREIGN                   :
MEDICAL SERVICES, P.C., SPRUCE                       :
MEDICAL & DIAGNOSTIC, P.C., SUMMIT                   :
MEDICAL SERVICES, P.C., URBAN                        :
MEDICAL, P.C., ROMAN MATATOV,                        :
URIYEL MIRZAKANDOV, and                              :
RUBEN LEVY a/k/a RUBEN LEVIYEV,                      :
                                                     :
                              Defendants.            :
---------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On March 19, 2024, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company (collectively, "Plaintiffs") commenced this action against Jonathan S. Landow, Viviane Etienne (collectively, "M.D. Defendants"), Atlantic Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Eastern Medical Practice, P.C., Empire Medical Services, P.C., Macintosh Medical, P.C., Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Summit Medical Services, P.C., Urban

Medical, P.C. (collectively, "PC Defendants")[1], Roman Israilov a/k/a Roman Matatov, Uriyel Mirzakandov, and Ruben Levy a/k/a Ruben Leviyev (collectively, "Managerial Defendants") alleging violations of the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, common law fraud, and unjust enrichment. Compl., Dkt. Entry No. 1 ¶ 15. Plaintiffs allege that all Defendants collectively engaged in a scheme to defraud Plaintiffs via New York's No Fault insurance statutory framework ("No Fault").

Plaintiffs moved for the issuance of a preliminary injunction ("Mot.") seeking a stay of all current No Fault arbitrations filed against them by the PC Defendants, and an injunction enjoining the PC Defendants from filing any new No Fault arbitration proceedings or state court collection suits during the pendency of this action. Mot., Dkt. Entry No. 50-1 at 6. Defendants opposed the motion. Def. Opp'n ("Opp'n"), Dkt. Entry No. 51. Plaintiffs replied ("Reply"). Dkt. Entry No. 52. On February 18, 2026, Plaintiffs moved to amend/correct/supplement the instant motion to request that the preliminary injunction be extended to stay pending State Court litigation pursuant to recent Second Circuit caselaw, which is discussed further below. *See,* Dkt. Entry No. 166. PC Defendants did not respond to the motion, which is deemed unopposed. For the reasons set forth below, the motion for a preliminary injunction is granted in its entirety.

## **BACKGROUND[2]**

### I.    **New York's No Fault Insurance Regime**

At the heart of this case is New York's No Fault statutory framework and Defendants' alleged operation of a fraudulent scheme to exploit this framework to collect illegal or inflated medical costs from Plaintiffs. New York's No Fault laws were designed to ensure that injured

---

[1] On March 25, 2026, Plaintiffs dismissed most of the PC Defendants from this case by filing a stipulation of dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). *See*, Dkt. Entry No. 172. Atlantic Medical & Diagnostic, P.C. and Macintosh Medical, P.C. are the only PC Defendants remaining in this action.

[2] The facts below are taken from the Complaint and any incorporated documents.

victims of motor vehicle accidents would have a way to pay costs for necessary healthcare services. *See*, 11 NYCRR §§ 65-3.1–3.20 (collectively, the "No Fault Laws"). The No Fault laws provide compensation for "basic economic loss," which covers "necessary" health expenses up to $50,000 per person. N.Y. Ins. Law § 5102(a). A covered individual may assign these No Fault benefits to licensed health care providers in exchange for services, which the providers submit to the insurers for payment. *See*, 11 NYCRR 65-3.11(a). The insurer must make a determination whether to pay the claim based on the materials submitted within 30 days after receiving proof of the claim or the claim becomes overdue. 11 NYCRR 65-3.8(a) ("30-day Rule"). A denial of a claim or an overdue claim may be submitted to arbitration in which the applicant must submit a "detailed listing and calculation of all incurred expenses in dispute." 11 NYCRR 65-4.2(b)(1)(i). These arbitrations have simplified procedures and provide an expedited option for certain claims. Insurance Law § 5106(b); *See*, 11 NYCRR 65-4.5.

This statutory framework requires that the medical services provider be operated only by a licensed professional, such as a physician. *See,* N.Y. Bus. Corp. Law §§ 1503(b), 1507, 1508(a). Additionally, any person who, knowingly and with intent to defraud any insurance company, files a claim containing materially false information, or conceals information for the purpose of misleading, commits a fraudulent insurance act. *See*, N.Y. Ins. Law § 403(d). Providers are prohibited from paying or receiving kickbacks in exchange for patient referrals or in connection with the performance of professional services. *See,* N.Y. Educ. Law § 6530(11), (18)–(19); N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3)–(4). Failure to meet any applicable New York State or local licensing requirements results in the ineligibility to receive reimbursement for No Fault claims. 11 NYCRR 65-3.16(a)(12).

## II.    Defendants' Alleged Scheme

Plaintiffs allege an extensive scheme in which Defendants collectively defraud insurance companies by taking advantage of New York's No Fault laws.  Plaintiffs claim that the M.D. Defendants scout and sublease various clinics and PC Defendant locations from the Managerial Defendants.  Compl. ¶¶ 182–85.  When a sublease is established, M.D. Defendants pay a "rent" amount between $1,000 to $2,500 to the Managerial Defendants, but these "rent" amounts are based on the volume of patients referred to the PC Defendants.  *Id*. ¶¶ 198–99.  The referrals are obtained by "runners" employed by the Managerial Defendants who bribe hospital employees and 911 operators in exchange for patient information.  *Id*. ¶¶ 185; 191.  In effect, the "rent" payments are kickbacks for access to the referrals and patient base at the PC Defendants' locations and constitute impermissible fee sharing.  *Id*. ¶¶ 179; 191.  Plaintiffs allege further that the PC Defendants are merely "medical mills" that perform medically unnecessary services to increase claim costs.  *Id*. ¶ 195.

Plaintiffs contend further that the M.D. Defendants actually do not operate or manage any of the PC Defendant locations.  *Id*. ¶¶ 207–10.  Instead, the PC Defendants are managed by the Managerial Defendants or office administrators.  *Id*. ¶ 209.  Therefore, the PC Defendants are not operated by a licensed professional as statutorily required.  In addition, the PC Defendants are alleged to have submitted fraudulent claims for insureds who went through prolonged and numerous treatments, regardless of whether the patients needed or wanted the services.  *Id*. ¶¶ 244–45.

Plaintiffs allege that, as a result of the Defendants' illicit activities, they paid over $3,556,518.47 in fraudulent claims.  *Id*. ¶ 17.  Thus, Plaintiffs seek to recover the payments already made, treble damages, and a declaration that they have no legal obligation to make any payments on any No Fault insurance claims submitted by or on behalf of the PC Defendants.  *Id*. ¶¶ 17–18.

4

Plaintiffs also seek a preliminary injunction staying all pending and potential future arbitrations and lawsuits by the PC Defendants during the pendency of this case.

## LEGAL STANDARD

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted). "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). "Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id*. (internal citation omitted). Such relief is an extraordinary and drastic remedy, and should not be granted unless the movant carries the burden of persuasion by a clear showing. *See, Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005).

## DISCUSSION

### I.    Irreparable Harm[3]

The single largest dispute in this preliminary injunction motion is whether the movant has shown irreparable harm. Plaintiffs argue that there are two grounds for irreparable harm: (1) they

---

[3] While Defendants did not raise the Anti-Injunction Act as a defense in its opposition, the Court notes that the Second Circuit twice has held that RICO "expressly authorized" enjoining state actions in No Fault cases involving hundreds of baseless state-court proceedings that are part of a massive fraudulent scheme in furtherance of a RICO violation.

will expend significant money, time, and effort litigating the "morass" of arbitrations Defendants have or will file against them; and (2) there is a risk of "inconsistent rulings" should the proceedings outside of this case be allowed to continue.  Mot. at 13–15.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (citing *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2nd 42, 45 (2d Cir. 1983)).  A showing of irreparable harm is an "absolute requirement for a preliminary injunction."  *Holt v. Continental Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983).  To show irreparable harm, "[t]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).

An irreparable harm is one in which the party requesting relief cannot be returned to the position they previously occupied prior to final resolution of the action.  *See, Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999).  The Second Circuit consistently has held that monetary injury will not establish irreparable harm.  *Id*. ("As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm.")  A narrow caveat is when the movant can establish that it would go bankrupt absent interim relief.  *See, Miss Am. Org. v. Mattel, Inc.*, 945 F.2d 536, 546 (2d Cir. 1991).  Additionally, in one of the three Second Circuit cases addressing the No Fault regime, the circuit held that "mere injuries . . . in terms of money, time and energy necessarily expended absent a stay of ongoing state court arbitration proceedings are not enough to establish

---

*See, State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 98–99 (2d Cir. 2024); *See also, Gov't Emps. Ins. Co. v. Bhargav Patel*, 166 F.4th 280, 299 (2d Cir. 2026).

irreparable harm." *Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017) (internal citation and quotation marks omitted).

Plaintiffs have failed to distinguish their extensive expenditure of "time, effort, and money" argument from those previously dismissed by the Second Circuit, nor have they shown why they cannot recover such monetary damages from a successful RICO award with treble damages. As such, Plaintiffs have failed to establish irreparable harm on this ground.

However, Plaintiffs also maintain that, absent an injunction, the myriad of arbitrations and state court proceedings, both pending and future, will result in inconsistent outcomes. They argue that the arbitration proceedings lack extensive discovery and record building heightening this risk. Mot. at 14. Plaintiffs further contend that these potentially inconsistent rulings may have *res judicata* effect that can affect their ability to litigate this matter adversely. *Id*. at 15. Defendants characterize Plaintiffs' "inconsistent rulings" argument as a red herring. They argue that, ultimately, Plaintiffs' only harm is the reimbursements potentially awarded against them in these arbitration proceedings, and they are free to recover those payments should they prevail on their RICO claim. Opp'n at 13. Defendants also contend that No Fault arbitrations will not reach the issue of fraud, the central issue in this case and, thus, would have no preclusive effect. *Id*. at 16 (citing *Allstate Ins. Co. v. Avetisyan*, 2018 WL 6344249, at *4 (E.D.N.Y. Oct. 30, 2018)).

Two recent Second Circuit decisions now firmly establish that in No Fault RICO cases with hundreds of pending arbitrations and state court proceedings, such as this case, irreparable harm is established due to the "obscuring" of the alleged fraud and the risk of inconsistent rulings. *See generally*, *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80–81 (2d Cir. 2024) (finding irreparable harm where hundreds of fragmented proceedings end up obscuring the alleged fraud); *See also, Gov't Emps. Ins. Co. v. Bhargav Patel*, 166 F.4th 280, 292 (2d Cir. 2026) (finding irreparable harm where plaintiff's ability to prove a complex fraud scheme

7

through hundreds of proceedings is severely undermined by their fragmented nature).  Just as in the Second Circuit cases, this case involves hundreds of state proceedings, and Plaintiffs maintain that they cannot prove the fraudulent scheme sufficiently unless viewed as a collective.  *See*, Mot. at 19.  Accordingly, there is no discernable difference between the present action and the circuit cases discussed above.

The Second Circuit further found that the harm that may be caused by inconsistent rulings in these No Fault cases is their potential preclusive effect.  *See, State Farm Mut. Auto. Ins. Co.*, 120 F.4th at 80.  In holding that inconsistent rulings constitute irreparable harm, the circuit stated, "it is settled law that state-court judgments can have a preclusive effect in federal court . . . it is likewise settled 'that res judicata and collateral estoppel apply to issues resolved by arbitration where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award.'"  *Id*. at 81 (citing *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267–68 (2d Cir. 1997)).  The Second Circuit further reasoned that, "[b]ecause the arbitrations and state-court proceedings here *could* determine that certain claims were reimbursable based on findings of medical necessity for individual patients, those decisions could have a preclusive effect in this action, thereby preventing complete relief to [Plaintiff] if it is so entitled."  *Id*. (emphasis added).[4] Therefore, inconsistent rulings in the numerous state proceedings create the risk of preclusive rulings, which may affect the Court's ability to afford complete relief resulting in irreparable harm to Plaintiffs.

While Defendants maintain that the No Fault arbitrations will not reach the issue of fraud, they cannot know that with any certainty.  It is possible that one or more arbitrations could reach the issue.  Plaintiffs stated that, currently, there are over 540 arbitrations pending, with the risk of

---

[4] In *Patel*, The Second Circuit reiterated its holding in *State Farm* that the risk of preclusive effects stemming from inconsistent rulings in state No Fault proceedings contributes to the irreparable harm these proceedings subject insurers to.  *See, Bhargav Patel*, 166 F.4th at 293–94.

many more waiting in the wings. *See*, Michael Bruno Decl., Dkt. Entry No. 50-2 at 8. While some of these pending arbitration proceedings may never discuss fraud, some might. *State Farm Mut. Auto. Ins. Co.,* 120 F.4th at 81 ("But it is premature at this point to attempt to ascertain the definitive preclusive effect of such proceedings because our task at this juncture is solely to determine whether there is a sufficient showing of a risk of irreparable harm absent an injunction. We believe there is."). Therefore, Plaintiffs have established sufficiently a risk of irreparable harm due to the potential preclusive effect of inconsistent state arbitration rulings.

Relying primarily on trademark cases, Defendants counter that Plaintiffs' delay in requesting a preliminary injunction precludes a finding of irreparable harm. This argument is unavailing. Defendants further claim that Plaintiffs continued to pay reimbursements for years despite having conducted Defendant Landow's Examinations Under Oath ("EUOs") in 2019 and 2020. Opp'n at 23. Defendants conclude that, as such, Plaintiffs had reason to know that the PC Defendants were filing fraudulent arbitration proceedings as early as 2020.[5] *Id*. at 23–24. Plaintiffs counter that they took the EUOs to "verify claims for patient treatment," not to conduct a fraud investigation. Reply at 9. They further contend that any delay in seeking a preliminary injunction stems from Defendants' efforts to conceal their fraudulent scheme and that they acted "as promptly as possible in filing its Complaint." *Id*.

In 1985, the Second Circuit held that "delay in [seeking] injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm . . . and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A.*, 756 F.2d at 276. The circuit reasoned that, when a plaintiff is aware its trademark is being infringed upon, the dilution of its trademark causes irreparable harm and, therefore, a

---

[5] Perplexingly, Defendants' argument necessarily implies that they were committing fraud in 2020, which Plaintiffs should have detected. On the other hand, if there was no fraud in 2020, Plaintiffs did not delay at all.

9

delay in enforcing its rights undercuts any sense of urgency. *Id*. at 277. This conclusion has been upheld in subsequent Second Circuit trademark cases. *See, Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (concluding there was no irreparable harm in a trademark infringement case where plaintiff was aware of the infringement for more than a year); *See also*, *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("A plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury. This presumption may be defeated [] when a party has delayed in seeking injunctive relief.").

In the scant Second Circuit cases outside of trademark infringement that address delay, the circuit has adhered to the general proposition that "delay in seeking enforcement of [a plaintiff's] rights . . . tends to indicate at least a reduced need for such drastic, speedy action." *Williams v. Harry's Nurses Registry, Inc.*, 2025 WL 842041, at *5 (2d Cir. Mar. 18, 2025) (internal citation omitted). However, the Second Circuit also has held that delay, standing alone, is insufficient to demonstrate the absence of irreparable harm as delay is merely a factor to be considered when courts conduct their irreparable harm analysis. *See, Tripathy v. Lockwood*, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) (holding that a 29-month delay in moving for a preliminary injunction did not demonstrate the absence of irreparable injury in a First Amendment case).

At the outset, this is not a trademark infringement case. Thus, the concern about "dilution" of one's rights is not as critical. This case is similar to First Amendment cases insofar as the harm of on-going fraud does not lessen over time. Delay, standing alone, does not preclude the finding of irreparable harm in this case. *Id*. Moreover, Defendants have not shown that Plaintiffs actually were aware of the fraud in 2020. It is speculative to conclude that taking an EUO to "verify claims for patient treatment" means that Plaintiffs became aware of an alleged complex fraudulent scheme. At the latest, Plaintiffs were aware of the alleged fraudulent scheme when they filed suit

in March 2024.  Dkt. Entry No. 1.  While there was a three-month delay from the time Plaintiffs filed their suit to the time they filed a motion for preliminary injunction, the Court does not find that this precludes the finding of irreparable harm.  Especially given the Court's analysis regarding the risk of the potential preclusive effects of inconsistent rulings consistent with current Second Circuit caselaw.

## II.    Sufficiently Serious Questions Going to the Merits

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Citigroup*, 598 F.3d at 35.  "The 'serious questions' standard allows courts to 'assess[] the merits of a claim at the preliminary injunction stage' by affording considerable 'flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'"  *State Farm Mut. Auto. Ins. Co.,* 120 F.4th at 83 (quoting *Citigroup*, 598 F.3d at 35)).  The flexible nature of the "serious questions" standard gives courts the discretion to rely on the pleadings and accompanying affidavits as opposed to holding an evidentiary hearing when deciding whether to issue a preliminary injunction. *Id*.

The record before the Court establishes serious questions going to the merits.  The instant case is strikingly similar to *State Farm Mut. Auto. Ins. Co. Id.*  In that case, State Farm Mutual Auto Insurance Co. filed a 159-page complaint outlining a scheme of kickbacks for patient referrals, predetermined treatment protocols utilized at the clinic, operation of clinics by laypersons, and other fraudulent methods to obtain No Fault benefits.  *Id*. at 84.  There, the circuit upheld the district court's finding of sufficient serious questions going to the merits given the extensive allegations in the complaint.  *Id*.

11

Here, Plaintiffs filed a 187-page complaint, including dozens of pages of exhibits, detailing a scheme of kickbacks for patient referrals, operation of clinics by laypersons, lack of medical care provided by the M.D. Defendants, and predetermined and trumped up medical treatments. *See*, Compl. ¶¶ 182–99; 207–10; 244; 245. These facts are similar to those in other cases in this district in which the courts have found serious questions going to the merits. *See*, *Gov't Emps. Ins. Co. v. Zaitsev*, 2021 WL 3173171 *2 (E.D.N.Y. July 27, 2021) (finding serious questions going to the merits where the complaint alleged submission of medically unnecessary procedures, exaggerated services, illegal kickbacks and referrals, and misrepresentations of compliance with relevant laws and regulations); *See*, *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp.3d 443, 453–54 (E.D.N.Y. 2020) (finding serious questions on the merits where GEICO alleged and submitted evidence of numerous medically unnecessary procedures). In accord with the analogous cases in this circuit, this Court concludes that Plaintiffs sufficiently have shown that there are serious questions going to the merits. *Id*.

## III.    Balance of Hardships

The Court must determine whether Plaintiffs have demonstrated that the balance of hardships tips decidedly in their favor. In making that determination, "[the court] must balance the competing claims of injury and must consider the effect on each party of granting or withholding of the requested relief." *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (internal citation and quotation marks omitted). "This factor is 'related' to the irreparable harm requirement as 'both . . . consider the harm to the parties' with the relevant harm being that which '(a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Tri-Borough NY Med. Prac. P.C.,* 120 F.4th at 84–85 (quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)).

12

Plaintiffs maintain that New York's No Fault arbitration fora do not allow them to conduct discovery and properly build a record necessary to resolve the complex fraud scheme alleged here. Mot. at 20–21. Plaintiffs contend they will suffer significant financial harm based on the time and expense of litigating or vacating arbitration awards entered in favor of PC Defendants. *Id*. Defendants counter that Plaintiffs could recoup any wrongly awarded arbitration payments, if successful, and that national insurance businesses like Plaintiffs are able to litigate and cover expenses, whereas a complete stay of payments would be devastating financially to their small medical practices. *See*, Opp'n at 24–25.

While, from a purely monetary standpoint, Plaintiffs may be able to "weather the storm" of arbitration costs better than Defendants, Defendants presumably have other insurers that can provide them with income, and they have not argued to the contrary. Notably, as set forth above, Plaintiffs are at risk of irreparable harm should any of these arbitrations or potential state claims reach the merits of the fraud allegations, or other allegations, which could have a preclusive effect on this Court's ability to provide relief. Accordingly, while Defendants may suffer some hardships upon the issuance of a preliminary injunction, the risk of irreparable harm, and absence of facts showing that Defendants would go out of business if they are unable to pursue reimbursements temporarily against Plaintiffs decidedly tip the balance of hardships in Plaintiffs favor.

## IV.    Public Interest

The Court also must consider whether the preliminary injunction is in the public interest, "which concerns the public consequences in employing the extraordinary remedy of injunction." *State Farm Mut. Auto. Ins. Co.,* 120 F.4th at 85 (internal citation and quotation marks omitted). Both parties failed to address this factor in their motion briefing. Nonetheless, the Second Circuit has held that a preliminary injunction "is clearly in the public['s] interest" in these No Fault insurance fraud cases. *Id*.; *See also, Allstate Ins. Co. v. Mun*, 751 F.3d 94, 100 (2d Cir. 2014)

(stating that "the prevention of insurance fraud for the protection of consumers in New York" is an "important public policy interest") (internal quotation marks omitted)).  This case involves the same type of No Fault fraud allegations addressed by the Second Circuit in these precedents. Therefore, a preliminary injunction here is "clearly in the public's interest."

## V.      Security Bond

Federal Rule of Civil Procedure 65(c) states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The rule gives district courts wide discretion to set the amount of a bond or to completely dispense with the bond requirement depending on the circumstances.  *See*, *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004).

Plaintiffs state that "there is no risk of harm" here because "Allstate has the resources to pay any eventual No-Fault awards," and request that the security requirement be waived.  Mot. at 21–22.  Defendants failed to address the necessity of a security bond in their opposition to the motion.  *See generally*, Opp'n.  Accordingly, the security requirement of Rule 65(c) is waived.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

**<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is granted. Accordingly, it is hereby ORDERED that: (1) all current No Fault arbitrations and State Court Litigation filed by PC Defendants against Plaintiffs are stayed pending the resolution of this case; and (2) the PC Defendants, including their principals, agents, and counsels, are enjoined from initiating any further No Fault collection arbitrations or state court proceedings against Plaintiffs until the resolution of this case.

SO ORDERED.

Dated: Brooklyn, New York
         March 30, 2026

/s/
DORA L.  IRIZARRY
United States District Judge

15